# Exhibit A

# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

_____ ALLEGHENY _____ **County**

| For Prothonotary Use Only: | TIME STAMP |
|---|---|
| Docket No: | |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

Lead Plaintiff's Name:
JUSTIN SCHREIBER

Lead Defendant's Name:
CHRISTIAN MATTHEW LAMARCO

**Are money damages requested?** ☒ Yes   ☐ No

Dollar Amount Requested: (check one)
- ☐ within arbitration limits
- ☒ outside arbitration limits

**Is this a *Class Action Suit*?**   ☐ Yes   ☒ No

**Is this an *MDJ Appeal*?**   ☐ Yes   ☒ No

Name of Plaintiff/Appellant's Attorney: S. MANOJ JEGASOTHY, ESQUIRE AND JESSICA G. LUCAS, ESQUIRE

☐ **Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)**

**SECTION B**

**Nature of the Case**: Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☒ Slander/Libel/ Defamation
- ☐ Other: _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional: _____

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other
  _____

- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
  _____

- ☐ Other:
  _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other:
  _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other
  _____

- ☐ Zoning Board
- ☐ Other:
  _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other:
  _____

*Updated 1/1/2011*

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| LIFEMD, INC.; | : | CIVIL DIVISION |
| | : | |
| JUSTIN SCHREIBER, | : | Case No. GD- 21-011364 |
| | : | |
| and | : | |
| | : | **COMPLAINT** |
| STEFAN GALLUPPI, | : | |
| | : | |
|    Plaintiffs, | : | Filed on behalf of Plaintiffs |
| | : | |
| v. | : | Counsel for this party: |
| | : | |
| CHRISTIAN MATTHEW LAMARCO; | : | S. Manoj Jegasothy, Esquire |
| | : | PA ID No. 80084 |
| SHADYSIDE PARTNERS, LLC | : | |
| (d/b/a CULPER RESEARCH); | : | Jessica G. Lucas, Esquire |
| | : | PA ID No. 311280 |
| and | : | |
| | : | Gordon Rees Scully Mansukhani, LLP |
| JOHN/JANE DOES 2-10 | : | 707 Grant Street, Suite 3800 |
| (*individuals, corporations, organizations, or* | : | Pittsburgh, PA   15219 |
| *other legal entities whose names and addresses* | : | Tel: (412) 577-7400 |
| *are presently unknown and who worked with or* | : | Fax: (412) 347-5461 |
| *for the named defendants and/or provided* | : | mjegasothy@grsm.com |
| *substantial assistance or encouragement to same* | : | jlucas@grsm.com |
| *in the form of financial, information, or legal* | : | |
| *support*), | : | **JURY TRIAL DEMANDED** |
| | : | |
|    Defendants. | : | |
| | : | |

**NOTICE TO PLEAD:**

**To: Defendants, Christian Matthew Lamarco, Shadyside Partners, LLC (d/b/a Culper Research), and John/Jane Does 2-10:**

**YOU ARE HEREBY NOTIFIED TO PLEAD TO THE ENCLOSED COMPLAINT WITHIN TWENTY (20) DAYS FROM THE SERVICE HEREOF OR A DEFAULT JUDGMENT MAY BE ENTERED AGAINST YOU.**

     */s/ Jessica G. Lucas, Esquire*
      Jessica G. Lucas, Esquire
      Counsel for Plaintiffs

## NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Allegheny County Bar Association
400 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
(412) 261-6161

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| LIFEMD, INC.; | : | CIVIL DIVISION |
| JUSTIN SCHREIBER, | : | Case No. GD- 21-011364 |
| and | : | |
| STEFAN GALLUPPI, | : | |
| Plaintiffs, | : | |
| v. | : | **JURY TRIAL DEMANDED** |
| CHRISTIAN MATTHEW LAMARCO; | : | |
| SHADYSIDE PARTNERS, LLC (d/b/a CULPER RESEARCH); | : | |
| and | : | |
| JOHN/JANE DOES 2-10 (*individuals, corporations, organizations, or other legal entities whose names and addresses are presently unknown and who worked with or for the named defendants and/or provided substantial assistance or encouragement to same in the form of financial, information, or legal support*), | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiffs, LifeMD, Inc. ("LifeMD"), Justin Schreiber ("Schreiber"), and Stefan Galluppi ("Galluppi") (collectively "Plaintiffs"), by undersigned counsel, hereby file this Complaint against Defendants, Christian Matthew Lamarco ("Lamarco"), Shadyside Partners, LLC (d/b/a "Culper Research"), and John/Jane Does 2-10 (collectively "Defendants"), averring as follows:

## NATURE OF ACTION

1.      This action arises from a classic "short and distort" stock scheme.  In a "short and distort" stock scheme, short-sellers borrow securities, sell them, and then drive the price of their

target company's stock down by spreading materially false, misleading, defamatory, and disparaging information about the company. Once the company's stock drops to an artificially low price, the short-sellers repurchase and return the borrowed securities, pocketing the difference. This is precisely what Defendants, known and unknown short-sellers, have done against Plaintiffs.

2.      Plaintiffs bring this action for claims of defamation, trade libel, false light, unjust enrichment, deceptive trade practices, unfair competition, conspiracy, and aiding and abetting to recover damages and secure injunctive relief against Defendants for their intentional and malicious scheme to manipulate the securities markets in order to secure a quick and illegal financial windfall, by disseminating and publishing false, misleading, defamatory, offensive, and disparaging statements about Plaintiffs.

3.      These statements falsely accused Plaintiffs of fraud, lies, cover-ups, potential crimes and illegal acts, insider dealing, and abusive, unfair, and deceptive business practices.

4.      These statements caused significant harm to Plaintiffs, including artificial depression of LifeMD's stock price and market value; higher costs of capital; expenses to defend against class action lawsuits and negative media attention; damage to business relationships with contractual partners, investors, bankers, and other lenders; injury to Plaintiffs' reputation and goodwill; emotional pain, suffering, and humiliation for the individual Plaintiffs; and disruption of the business affairs of LifeMD, which continues to this day as Plaintiffs seek to attract investors, recruit talent, and form strategic partnerships.

## JURISDICTION & VENUE

5.      This Court has subject matter jurisdiction over this matter pursuant to 42 Pa. Cons. Stat. § 931.

6.      This Court has personal jurisdiction over Lamarco, Culper Research, and John/Jane

- 4 -

Does pursuant to 42 Pa. Cons. Stat. §§ 5301 and 5322 because, on information and belief, they purposefully availed themselves of the benefits and protections of the Commonwealth of Pennsylvania by, among other things, working with or for Lamarco, a resident of Pittsburgh, Pennsylvania transacting business in and outside this County, to cause harm by acts or omissions in Pennsylvania, as set forth below, and caused harm in Pennsylvania and elsewhere by acts or omissions outside Pennsylvania, as set forth below.

7.     This Court is a proper venue pursuant to Pa. R. Civ. P. 302 and 2179 because, on information and belief, the acts and/or injuries that give rise to the claims asserted herein occurred, in whole or in part, in this County.

## PARTIES

8.     Plaintiff LifeMD, Inc. is a direct-to-consumer, publicly traded telehealth company incorporated under the laws of Delaware.

9.     Plaintiff Justin Schreiber is an individual residing in Dorado, Puerto Rico, 00646. Schreiber is LifeMD's Chairman and CEO.

10.     Plaintiff Stefan Galluppi is an individual residing in Huntington Beach, California 92649. Galluppi is LifeMD's Chief Technology Officer (CTO).

11.     Defendant Christian Matthew Lamarco is an individual residing at 3934 Foster Street, B410, Pittsburgh, PA 15201.

12.     Defendant Shadyside Partners, LLC (d/b/a "Culper Research") is a limited liability company under the laws of Delaware that publishes purported "investigative investment research" reports through its website at www.culperresearch.com and through postings on Twitter as @CulperResearch.

13.     On information and belief, Lamarco is the sole member of Culper Research; owns and controls Culper Research; and, at all relevant times, directed, authorized, and/or was responsible for false and defamatory statements made about, and tortious acts against, Plaintiffs by Culper Research.

14.     Defendants John/Jane Does 2–10, whose true names are unknown, are individuals or entities who worked with or for Lamarco and/or Culper Research and provided substantial assistance or encouragement to same (*e.g.*, financial, information, legal support) in connection with false and defamatory statements made about, and tortious acts against, Plaintiffs by Lamarco and/or Culper Research, and include, on information and belief, members, partners, affiliates, employees, consultants, clients, investors, agents, and/or counsel of or for Lamarco and/or Culper Research. Plaintiffs will seek leave of court to amend this Complaint and insert the true names of John/Jane Does 2-10 in place of their fictitious names when Plaintiffs discover the same.

## FACTUAL ALLEGATIONS

### Background Information

15.     LifeMD™ is a leading telehealth company that is transforming the healthcare landscape with direct-to-patient product and service offerings. LifeMD's telemedicine platform enables virtual access to affordable and convenient medical treatment from licensed providers and, when appropriate, prescription medications and over-the-counter products delivered directly to the patient's home.

16.     LifeMD offers a full range of subscription-based proprietary telehealth products and services, including REX MD™—telehealth for men, Shapiro MD™—telehealth for hair loss, and NavaMD™—teledermatology offering for women.

17.     LifeMD strives to build telemedicine brands that combine best-in-class virtual care

with prescription medications (if appropriate) and patented over-the-counter products supported by thought-leading medical providers.

18.   LifeMD began as a start-up, financed through multiple rounds of venture capital funding. In doing so, some of the most sophisticated institutional investors and advisors in the world have conducted countless hours of extensive due diligence validating LifeMD prior to investing.

19.   LifeMD maintains a network of licensed medical providers and doctors who are board certified to treat patients and dispense prescription medications.

20.   LifeMD takes the utmost care in creating an environment that fosters the highest standard of care for patients. All medical providers prescribing medications for LifeMD brands are regularly monitored for good standing by a third-party company that governs compliance for critical industries such as telehealth.

21.   LifeMD is managed by a seasoned team of experienced and dedicated professionals, including:

a)  Justin Schreiber (Chairman & CEO) – Schreiber has deep experience in both healthcare and finance and was the largest direct investor in LifeMD prior to the Company raising its first round of institutional capital. Schreiber also serves as the President and founder of JLS Ventures, an investment and capital markets advisory firm that invests in and consults with emerging growth publicly traded companies. In addition to his capital markets experience, Schreiber previously worked for a global healthcare consulting firm as well as in the foreign currency trading business. He holds a BS in International Business from Elizabethtown College and a BA in International Management from the ICN École de management in Nancy, France; and

b)  Stefan Galluppi (CTO) – Stefan Galluppi was the Chief Operating Officer and CTO of Immudyne, a predecessor to LifeMD. Galluppi combines over 10 years of experience in building technology platforms for direct to consumer marketing campaigns. Previously, he served as the CTO of Runaway Products, a DRTV driven marketing firm with a core focus on building and optimizing systems to scale campaigns for maximum efficiency and profitability.

22.     Culper Research is purportedly a stock research firm that disseminates its research reports throughout Pennsylvania and the United States via its website, www.culperresearch.com, and through other media. It also represents itself to the public as an anonymous short-seller.

23.     In June 2019, Culper Research formed as a limited liability company in Delaware and created its presence on the web for the apparent purpose of destroying the reputations of, and causing harm to, various publicly traded companies, including LifeMD.

24.     Culper Research undertook to appear to the public as a reputable stock research firm by creating an entity with the term "Research" in the name, referring to itself as involved in long and short equity research, purporting to undertake extensive inquiry into LifeMD's (and other companies') operations, and even referring to each of its publications as "research reports."

25.     Legitimate stock research firms, however, do not attempt to hide or conceal the authors of their work, are typically affiliated with an investment bank, or seek to engage clients to receive ongoing research reports directly by subscription, and do not seek to hide the compensation they might receive from issuing "research reports."

26.     Culper Research, in conjunction with Lamarco and Does, has engaged in abusive "short-selling" of companies' stocks to reap massive profits at the expense of these companies and their shareholders—the very same fraudulent scheme that they have now deployed against Plaintiffs.

27.     Culper Research, in conjunction with Lamarco and Does, has a history of publishing unfounded, fraudulent "research reports" about companies as part of their short-selling schemes.

28.     Several other companies, including CytoDyn, Inc., Blink Charging, and CleanSpark, Inc., have been victim to Defendants' scheme, *i.e.*, publishing highly inflammatory

and derogatory "investigative research" reports to drive down the stock price and generate short seller gains for Defendants.

**Defendants Publish False and Defamatory Statements about Plaintiffs**

29.     On or about April 14, 2021, Culper Research published a false and defamatory report about Plaintiffs on its website www.culperresearch.com and via Twitter using @CulperResearch titled, *LifeMD, Inc. (LFMD): Redwood Redux at RexMD* (the "Report") (attached hereto as Ex. 1).

30.     The Report was published, without attribution to a specific author's name(s), on Culper Research's professional-looking website, complete with legal liability disclaimers, terms of service, copyright protection warnings, and a "Contact Us" submission form.

31.     By calling themselves "Culper Research" and using an image of an American patriot on their website, Defendants promoted themselves as a source to be trusted for valuable and helpful information.

32.     The Report was distributed globally on the internet, and has been disseminated or linked to other websites, including but not limited to the investor site seekingalpha.com and threadreaderapp.com.

33.     Specifically, Defendants made and published false, misleading, defamatory, offensive, and disparaging statements about Plaintiffs in the Report, such as the following:

> a.  *Redwood Scientific.* "Importantly, LifeMD executives – including CEO Justin Schreiber, CTO Stefan Galluppi, and the Company's two former CFOs – have apparently covered up their involved [sic] in Redwood Scientific's 'wide ranging fraud', which we think LifeMD now mirrors." Report at 2. "Undisclosed to current LifeMD investors, numerous LFMD insiders were intimately involved in varying aspects of Redwood [Scientific]'s 'wide-ranging fraud.'" *Id.* "We are highly concerned that LifeMD executives have not disclosed their involvement in material fraud, namely in Redwood Scientific, prior to joining LifeMD. We find this especially concerning in light of the business practices we believe are occurring at LifeMD which mirror those that landed Redwood federal charges." *Id.* at

3. Furthermore, the Defendants not only executed the fraud at Redwood, but after it was discovered, were found to have lied and obstructed the Courts, hiding their millions in illicit proceeds generated from the scheme. We believe many of these same practices have made their way to LifeMD, where the Company is now subjecting itself to the same risks." *Id.* "Apparently, unbeknownst to LifeMD investors, at least 4 current and past LifeMD executives were intricately involved in Redwood." *Id.* at 4. "LifeMD's corporate presentation touts its supposed 'proven management team' yet the slide conspicuously omits Schreiber and Galluppi's involvement in the Redwood Scientific Fraud." *Id.* "LifeMD Practices Mirror the Redwood Scientific Fraud." *Id.* at 5. "In light of the Company's apparent cover-up of involvement in the 'wide-ranging fraud' at Redwood (per the FTC), we are particularly concerned by LifeMD practices which we think mirror those at Redwood." *Id.* "Apart from the Company's apparent use of unlicensed doctors to dispense pills, we think LifeMD's current business practices mirror the same ones which landed Redwood in hot water." *Id.* at 10.

b. *Unlicensed Doctors.* "Namely, LifeMD appears to use unlicensed doctors to dispense OTC medications ..." Report at 2. "Not only does this render LifeMD's claims patently false, but potentially leaves the Company liable as an instrument to felony distribution of controlled substances." *Id.* "Redwood even claimed a revolutionary product for erectile dysfunction, just as LifeMD now apparently sells OTC ED pills relying on unlicensed doctors." *Id.* at 3. "This suggests, in our view, that LifeMD is either willfully ignorant of its doctors, or complicit in felonious acts." *Id.* at 7. "Apart from the Company's apparent use of unlicensed doctors to dispense pills, we think LifeMD's current business practices mirror the same ones which landed Redwood in hot water." *Id.* at 10.

c. *Insider Transactions.* "That said, this torrential cash burn hasn't stopped LFMD insiders from using the Company as a personal piggy bank. In 2020, $37.0 million in stock compensation was paid to insiders, not to mention numerous related party transactions. CEO Schreiber's father warehouses and fulfills the Company's Shapiro MD shampoo orders, and LifeMD paid CEO Schreiber 900,000 shares in 2019—an exorbitant sum—merely for credit card processing services." Report at 2-3. "At LifeMD, Insiders Win While Common Shareholders Lose." *Id.* at 15. "Despite the Company's torrential cash burn, insiders have collected health paychecks." *Id.* "This sheer level of insider enrichment concerns us, given Schreiber's propensity to participate in stock promotion schemes in which common shareholders are left holding the bag." *Id.* "Stock awards aside, insiders have enriched themselves via related-party transactions." *Id.*

d. *Deceptive Business.* "Namely, LifeMD appears to use unlicensed doctors to dispense OTC medications, has implemented an autoshipping/autobilling scheme, failed to honor guarantees, and put in place abusive telemarketing practices." Report at 2. "In October 2018, Redwood was charged by the FTC for 'wide-ranging fraud' which implemented unlawful autoshipping, abusive telemarketing, and false claims of its products. At LifeMD, numerous customer

reviews lead us to believe that the Company has implemented the same tactics. LifeMD touts its 'recurring revenue' model yet we think much of the Company's revenues are generated under false pretenses of 'one-time purchases'." *Id.* "In short, we think LifeMD's business is fatally flawed, unsustainable, and likely to draw regulatory scrutiny, especially in light of Schreiber and Galluppi's histories." *Id.* at 5. "Instead, we think LifeMD is a cash-burning direct marketing response business. The core driver of Rex MD, the Company's pill-pushing business, is a paid search and web marketing operation which only incinerates more shareholder cash over time." *Id.* at 8. "Apart from the Company's apparent use of unlicensed doctors to dispense pills, we think LifeMD's current business practices mirror the same ones which landed Redwood in hot water. Namely, numerous customer reviews allege that the Company engages in autoshipping, makes cancellations difficult if not impossible, and telephones consumers possibly in violation of TCPA laws." *Id.* at 10. "We think that a business whose core strength is built upon customer deception is unsustainable." *Id.* at 12.

e. *Cover-Up & Lies.* "Importantly, LifeMD executives – including CEO Justin Schreiber, CTO Stefan Galluppi, and the Company's two former CFOs – have apparently covered up their involved [sic] in Redwood Scientific's 'wide ranging fraud', which we think LifeMD now mirrors." Report at 2. "Finally, while LFMD disclosed in 2016 that CTO Stefan Galluppi previously served as Redwood's CTO, this disclosure was removed from Company materials in 2017, and Galluppi omits this 'experience' from his LinkedIn biography, effectively covering up involvement from current LifeMD investors." *Id.* "Not only does this render LifeMD's claims patently false, but potentially leaves the Company liable as an instrument to felony distribution of controlled substances." *Id.* "LifeMD Executives Omit 'Wide Ranging' Redwood Scientific Fraud from Their Resumes." *Id.* at 3. "We are highly concerned that LifeMD executives have not disclosed their involvement in material fraud, namely in Redwood Scientific, prior to joining LifeMD." *Id.* "Apparently, unbeknownst to LifeMD investors, at least 4 current and past LifeMD executives were intricately involved in Redwood." *Id.* at 4. "LifeMD's corporate presentation touts its supposed 'proven management team' yet the slide conspicuously omits Schreiber and Galluppi's involvement in the Redwood Scientific Fraud." *Id.* "However, in the Company's 2017 Form 10-K, the Company has removed all references to Redwood, suggesting, in our view, a cover-up attempt." *Id.* at 5. "In light of the Company's apparent cover-up of involvement in the 'wide-ranging fraud' at Redwood (per the FTC), we are particularly concerned by LifeMD practices which we think mirror those at Redwood." *Id.* "We remain unclear as to whether this was due to a change in service providers or if LifeMD is merely once again selectively disclosing negative information to investors." *Id.* at 16. "Appendix: LifeMD Has Hidden Past Involvement in Redwood Scientific." *Id.*

34.     Overall, these statements falsely accused Plaintiffs of fraud, lies, cover-ups, potential crimes and illegal acts, insider dealing, and abusive, unfair, and deceptive business

practices.

35.     Defendants presented these false statements, by content and context, as factual statements, not opinion.

36.     Indeed, Defendants portrayed the statements as their investigative findings—in an "Investigative Investment Research" 19-page document containing graphs, pictures, charts, screenshots, and an appendix—on fraud, concealment, criminal activity, insider dealings, and deceptive marketing practices committed by Plaintiffs.

37.     Defendants' purported "research" and representation that "all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable" added to the factual context of the Report.

38.     Readers of the Report relied and acted on the Report. As discussed below, financial analysts published negative "investor alerts" about LifeMD, while lawyers published "class action notices" and then filed class action lawsuits against LifeMD.

39.     Further, the media reported that the Report "made serious accusations against LifeMD" such as that "LifeMD and its executives are engaged in fraudulent and criminal business activities," LifeMD "uses unlicensed professional 'to dispense OTC medication,'" "LifeMD is engaged in fraudulent and illegal activities that are similar to those of Redwood Scientific, a company that faced severe legal penalties at the hands of the U.S. Federal Trade Commission (FTC) back in 2018," and LifeMD engages in "unlawful autoshipping, abusive telemarketing, and false claims of its products." *See, e.g.,*:

https://www.fool.com/investing/2021/04/14/why-lifemd-stock-is-getting-crushed-today/;

https://www.fool.com/investing/2021/04/19/why-lifemd-stock-is-plunging-today/.

40.     Each of Defendants' false and defamatory statements are capable of being proven true or false. Plaintiffs either did or did not engage in fraud, lie, cover-up, commit crimes or illegal acts, deal in unfair insider transactions, or deceive consumers. And Plaintiffs did not.

### *Patently False Redwood Scientific Statements*

41.     The Report distorts LifeMD executives' involvement with Redwood Scientific Technologies, Inc. ("Redwood Scientific"), by falsely stating and implying that Schreiber and Galluppi were engaged in fraud committed by Redwood Scientific.

42.     No current or former member of LifeMD's management team had a management role or significant equity ownership in Redwood Scientific at any time.

43.     Schreiber held only a passive investment and non-controlling interest in the company.

44.     Galluppi served as Redwood Scientific's CTO, but he held no equity in the company and tendered his resignation in October 2015, departing more than two and a half years prior to the FTC action against Redwood Scientific.

45.     The fact that Schreiber and Galluppi had no involvement in any fraud by Redwood Scientific is confirmed by the public filings in *Federal Trade Commission v. Cardiff, et al.*, 5:18-cv-02104 (C.D. Cal. 2018).

46.     The FTC sued Redwood Scientific, controlling individuals, and related entities, asserting unfair and deceptive trade practices.

47.     Neither Schreiber nor Galluppi was sued by the FTC, and their names do not even appear in the FTC's Uncontroverted Statement of Facts and Conclusions of Law in Support of its Motion for Summary Judgement, the FTC's response to Defendants' Statement of Facts, or the Court's Order Granting Plaintiff's Motion for Summary Judgment, which adopted the facts relied

upon by the FTC. *See Federal Trade Commission v. Cardiff, et al.,* 5:18-cv-02104 (C.D. Cal. 2018) DE 423-3, 499-1 & 511.

48.    This information was public and readily available to Defendants when they published the Report.

49.    The Report also distorts Plaintiffs' businesses, trades, and professions, by falsely stating and implying that Plaintiffs are engaged in the same types of fraud committed by Redwood Scientific.

50.    Plaintiffs have not engaged in fraud or illegal business practices.

### *Patently False Unlicensed Doctors Statements*

51.    The Report outright lies about LifeMD's licensing practices, using Dr. Badii and Dr. Kalter as purported examples of LifeMD's alleged widespread, and potentially criminal, use of unlicensed physicians to distribute controlled substances.

52.    LifeMD's physician network consists of nearly 90 board-certified and monitored medical providers who legally dispense prescription medications.

53.    Further, LifeMD has never allowed an unlicensed medical provider to perform a telehealth consult for any of its brands.

54.    The truth is that Dr. Badii was, and still is, a medical doctor licensed to treat patients and prescribe prescription medications in multiple states, which can be verified online through a simple web search.

55.    LifeMD, through its own quality assurance processes, discovered in March 2021 (*i.e.*, pre-Report) that Dr. Badii had been sanctioned by the DEA for issues related to prescribing controlled substances, and was barred from prescribing controlled substances.

56.    LifeMD immediately removed him from their physician network.

57.     LifeMD has never prescribed controlled substances, an elementary fact that could also be verified by anyone that reviewed the company's website and filings with the SEC.

58.     All treatments and medications prescribed by Dr. Badii for LifeMD were lawful and in compliance with all federal and state laws related to prescribing prescription medicine.

59.     In the case of Dr. Kalter, a web design error inadvertently listed Dr. Kalter as licensed in California rather than Massachusetts, where Dr. Kalter is licensed. As soon as LifeMD realized the error, it immediately fixed it.

60.     Notably, Dr. Kalter never performed a consult or wrote a single prescription for LifeMD in California, even though he would be permitted to do so pursuant to an executive order signed by California's Governor.

61.     This information was also readily available to Defendants when they published the Report.

### *Patently False Insider Transactions Statements*

62.     The Report also misrepresents transactions and dealings between LifeMD and its executives, including Schreiber, as either hidden, illegal or unfair, with specific references, for example, to BV Global Fulfillment and JLS Ventures.

63.     To the contrary, the rates LifeMD has paid, and still pays, to BV Global are in line with, if not lower than, what many third-party logistics providers charge for comparable services.

64.     In addition, as is typical in contracting with a third party logistics provider, LifeMD pays the shipping costs in connection with delivery of its telehealth products to consumers.

65.     Notably, LifeMD's relationship with BV Global is prominently disclosed in all of LifeMD's filings, and this relationship has never been flagged or mentioned as an issue in any audit or due diligence by institutions that have invested in LifeMD.

66.     This information, too, was readily available to Defendants when they published the Report.

67.     As for JLS Ventures, neither Schreiber nor JLS Ventures received any stock compensation for the credit card processing, as alleged in the Report, which fact was clearly stated in LifeMD's 2019 Form 10-K. Rather, the referenced shares were incentive based, for Schreiber's work as CEO.

68.     In truth, transactions and dealings between LifeMD and its executives were disclosed as required, legal, and fair.

### *Patently False Deceptive Business Statements*

69.     The Report also misleads readers about LifeMD's business practices by falsely stating and implying that LifeMD deceives consumers through "autoshipping/autobilling," "guarantee[ ]" promises, and "telemarketing practices."

70.     In addition, the Report falsely states and implies that this alleged consumer deception is attributable to "Schreiber and Galluppi's histories."

71.     In truth, Plaintiffs engaged in and subscribe to lawful business practices.

### *Patently False Cover-Up & Lies Statements*

72.     Significantly, the Report accuses Plaintiffs of covering-up and lying about many of the purported activities identified above, including alleged "involvement in material fraud" in Redwood Scientific, use of unlicensed doctors, and insider transactions with credit card processing companies.

73.     For the reasons stated above, these allegations are false.

74.     Moreover, Plaintiffs did not, and had no reason to, hide or deceive others about same.

**Plaintiffs Suffer Significant Damage because of the Report**

75.     Following the Report, LifeMD's stock price dropped $2.84, or 24%, to close at $9.00 per share on April 14, 2021.

76.     This led to a concomitant drop in LifeMD's market value, a loss of, and reduced ability to attract, investors, and higher costs of capital.

77.     Relatedly, the drop in LifeMD's stock price and market value directly affected Schreiber and Galluppi, as shareholders in LifeMD.

78.     Specifically, they suffered damage to their property and financial interests in LifeMD given that, at the time of the Report, Schreiber and Galluppi beneficially owned over 3 million and 1.5 million shares in LifeMD, respectively.

79.     Following the Report, at least two putative shareholder class action lawsuits were filed against LifeMD, *i.e., Owens Sr. v. LifeMD, Inc.,* Case No. 1:21-cv-03384 (S.D.N.Y. Apr. 2021) and *Cho v. LifeMD, Inc., et al.,* Case No. 1:21-cv-04004 (S.D.N.Y. May 2021), which incorporated many of the false and defamatory accusations in the Report, and which Plaintiffs had to defend at significant cost.

80.     Following the Report, Plaintiffs suffered other harm to their business, reputations, goodwill, and financial condition.

81.     Numerous financial bloggers and websites re-published the Report, in whole or in part, increasing the harm to Plaintiffs. Financial analysts issued negative "investor alerts." Readers of the Report thought the less of Plaintiffs, as engaged in criminal offenses, dishonest activities, and business misconduct.

82.     The media reported on LifeMD's stock price declines and class action lawsuits tied to the publication of the Report, warning investors that "LifeMD's shares will likely be highly volatile now that this [R]eport is out there, and I'd think twice about initiating a position this healthcare stock anytime soon." https://www.fool.com/investing/2021/04/14/why-lifemd-stock-is-getting-crushed-today/; *see also* https://www.fool.com/investing/2021/04/19/why-lifemd-stock-is-plunging-today/.

83.     LifeMD has lost potential investors, as well as business and recruiting opportunities, as a result of the false and defamatory accusations in the Report, including potential loans and investment in excess of $40M to be used for capitalization and expansion, and potential hires of software developers and other company personnel.

84.     LifeMD has incurred legal and other expenses as a result of the false and defamatory accusations in the Report, including investigatory and litigation costs connected with the class action lawsuits, this action (and its predecessor in federal court), and pursuit of the Doe Defendants.

85.     LifeMD has incurred costs associated with responding to media and third-party inquiries regarding the false and defamatory accusations in the Report, including crisis management and public relations expenses to counter the accusations.

86.     Following the Report, Schreiber and Galluppi's standing in the community has also been questioned and discredited.

87.     For example, social media posts in the investment community questioned Schreiber and Galluppi's involvement with Redwood Scientific, calling them "criminals," accusing them of fraud, questioning their management of LifeMD, and referring to them as "clowns."

**jackstrawnyc1**   Bearish   4/14/21, 07:18 AM   •••

$LFMD lol this is not surprising. Justin and Co are a bunch of criminals

**fesposti**   4/14/21, 11:06 AM   •••

$LFMD The fact that Justin Schreiber and Stefan Galluppi had already been together at a company that went under because of fraud is scary..

pmunch                                    Thursday, 04/15/21 08:21:48 AM
**Re: jefra1965 post# 35**
**Post #** `37`      of 71 `Go`

You would think these Clowns could contract with legit doctors !
What a disgrace ... it's a very easy thing to do.

Poor management and zero oversight ???

88.     As a result, Schreiber and Galluppi have suffered personal humiliation, mental anguish, and emotional distress.

89.     The full extent of the damage caused by Defendants is not yet known, but it is clear that Defendants and the libelous Report they created and publicized have already caused Plaintiffs significant damage and disruption of the business affairs of LifeMD, which continues to this day as Plaintiffs seek to attract investors, recruit talent, and form strategic partnerships.

**Defendants Acted Recklessly and Maliciously**

90.     As alleged above, the false, misleading, defamatory, offensive, and disparaging statements about Plaintiffs had their intended effect:  LifeMD's stock price plummeted, "investor alerts" and "class action notices" were issued, Plaintiffs' reputations and goodwill were tarnished, and Defendants secured a quick and illegal financial windfall.

91.     Defendants' acts in making and publishing these statements were intended to cause these consequences—*i.e.*, to drive down the price of LifeMD's stock so that Defendants could

make profitable short sales of that stock.

92.     To this end, Defendants sought to have the Report distributed as widely as possible by providing it—and Culper Research's Tweets—freely to investor news services and others on the internet.

93.     And by claiming at the outset of the Report that "all information contained herein is accurate and reliable" and based on "public sources we believe to be accurate and reliable," Defendants knew and intended that the false and defamatory statements set forth in the Report would convey false and defamatory factual implications and meanings concerning Plaintiffs to any person reading the Report or being informed of its contents.

94.     This, in turn, would cause panic and uncertainty regarding investment in LifeMD, especially in the eyes of LifeMD's shareholders.

95.     Defendants made and published the false and defamatory statements intending to damage Plaintiffs and artificially depress LifeMD's stock price for Defendants' own financial gain.

96.     Defendants substantially benefitted from the decline in LifeMD's stock price because Defendants began taking large short positions in LifeMD two months prior to the release of the Report.

97.     Defendants admit in the Report that the Report's authors had a "short position" in LifeMD in advance of publishing the Report.

98.     While Defendants do not disclose the exact size of the short position, the short interest ratio (the ratio of short interest to float) on LifeMD shares is instructive.

99.     NASDAQ, Inc., the exchange on which LifeMD is publicly traded, publishes the short interest for each issuer on its exchange twice a month. Short interest data is reported on mid-month and end-of-month settlement dates.

100.    On December 31, 2020, the short interest on LifeMD was 18,352 with an average daily share volume of 187,893—a 9.77% ratio.

101.    On February 12, 2021, the short interest on LifeMD was 420,789 with an average daily share volume of 1,555,062—a 27.06% ratio.

102.    On March 31, 2021, two weeks before the Report was published, the short interest on LifeMD was 1,152,971 with an average daily share volume of 747,679—a 154.21% ratio.

103.    Defendants made and published the false and defamatory statements knowing that the statements and their implications and meanings were false, or in reckless disregard of the truth or falsity of the statements. Defendants were at least negligent in ascertaining the truth or falsity of the statements.

104.    Public information, such as the FTC case against Cardiff referenced above, reflected that neither Schreiber nor Galluppi was sued or referenced by the FTC in the Redwood Scientific fraud case. No other public information implicated Plaintiffs in any fraudulent or illegal business activities.

105.    Defendants took no steps to discuss or confirm the contents of the Report with Plaintiffs prior to its publication.

106.    Moreover, it was not enough for Defendants to publish the false and defamatory Report; they published a follow-on false and defamatory second report over a month later.

107.    On May 27, 2021, shortly after Plaintiffs filed and served a federal defamation suit on Lamarco and Culper Research—which has since been voluntarily dismissed to bring this action in state court—Defendants published a second report on LifeMD (the "Second Report") (attached hereto as Ex. 2).

108.    It, like the Report, defamed and disparaged Plaintiffs with additional false statements of connections to Redwood Scientific fraud and new false statements suggesting Plaintiffs' involvement in stock schemes, illegitimate businesses, and fraudulent business practices.

109.    The Second Report stands as additional evidence of actual malice by Defendants and a relentless drive to harm Plaintiffs and the value of LifeMD.

110.    To this day, the Report and the Second Report remain available for viewing on the Culper Research website www.culperresearch.com (and Twitter) for re-publishing to others. Defendants refuse to take down and retract the reports despite Plaintiffs' claims.

## COUNT I
### Defamation
### (Plaintiffs v. All Defendants)

111.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

112.    Defendants made and published false and defamatory statements, without privilege or justification, about Plaintiffs in the Report, including that Plaintiffs engaged in fraud, lies, cover-ups, potential crimes and illegal acts, insider dealing, and abusive, unfair, and deceptive business practices.

113.    Defendants published or had published these statements to one or more persons other than Plaintiffs, by and through the internet at www.culperresearch.com and via Twitter.

114.    Recipients and readers of these statements understood their aforesaid defamatory meanings and implications, as well as that the statements were intended to be applied to Plaintiffs.

115.    These statements are defamatory *per se*, as they state and imply, among other things, that Plaintiffs committed criminal offenses and engaged in dishonesty and business

misconduct. These statements injured and prejudiced Plaintiffs in their business, trade, and professions.

116.   Defendants made and published the false and defamatory statements about Plaintiffs with actual or constructive knowledge that they were false or with reckless disregard as to whether they were true or false—and in an effort to malign Plaintiffs' reputation within the community.

117.   Alternatively, Defendants made and published the false and defamatory statements about Plaintiffs negligently, without exercising a reasonable level of care and diligence to ascertain the truth.

118.   The false and defamatory statements harmed Plaintiffs, by tending to lower their reputations in the estimation of the community and/or deter third persons from associating or dealing with them.

119.   As a direct and proximate result of the defamatory *per se* statements and/or defamatory statements made with actual malice, Plaintiff suffered presumed damages.

120.   As a direct and proximate result of Defendants' conduct, Plaintiffs suffered special damages, including a reduced stock price and market value, higher costs of capital, and expenses to defend against class action lawsuits and negative media attention.

121.   As a direct and proximate result of Defendants' conduct, Plaintiffs suffered actual and other damages in an amount to be proven at trial.

122.   Defendants' conduct was willful, malicious, intentional, wanton and/or reckless, thereby entitling Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request judgment against Defendants for compensatory, presumed, and punitive damages in an amount exceeding the jurisdictional

arbitration limits, plus costs, pre- and post-judgment interest, and other further relief as the Court may deem just and proper.

## COUNT II
### Trade Libel
### (LifeMD v. All Defendants)

123.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

124.    Defendants made and published false and disparaging statements about LifeMD in the Report, including that LifeMD engaged in fraud, lies, cover-ups, potential crimes and illegal acts, insider dealing, and abusive, unfair, and deceptive business practices.

125.    Defendants published these statements with actual or constructive knowledge that they were false or with reckless disregard as to whether they were true or false.

126.    Defendants published these statements with intent to cause pecuniary loss or should have reasonably known that publication would result in such loss.

127.    As a direct and proximate result of Defendants' conduct, LifeMD suffered pecuniary losses, including a reduced stock price and market value, higher costs of capital, and expenses to defend against class action lawsuits and negative media attention.

128.    As a direct and proximate result of Defendants' conduct, LifeMD suffered financial and other damages in an amount to be proven at trial.

129.    Defendants' conduct was willful, malicious, intentional, wanton and/or reckless, thereby entitling LifeMD to an award of punitive damages.

WHEREFORE, LifeMD respectfully requests judgment against Defendants for compensatory, presumed, and punitive damages in an amount exceeding the jurisdictional arbitration limits, plus costs, pre- and post-judgment interest, and other further relief as the Court

may deem just and proper.

## COUNT III
### False Light
### (Plaintiffs v. All Defendants)

130.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

131.    Defendants made false and highly offensive statements about Plaintiffs in the Report, including that Plaintiffs engaged in fraud, lies, cover-ups, potential crimes and illegal acts, insider dealing, and abusive, unfair, and deceptive business practices.

132.    Defendants published or had published these statements publicly and globally on the internet at www.culperresearch.com and via Twitter.

133.    Defendants either knew that these statements were false and would place Plaintiffs in a false light, or they acted with reckless disregard as to the falsity of these statements and the false light in which Plaintiffs would be placed.

134.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered financial and other damages in an amount to be proven at trial.

135.    Defendants' conduct was willful, malicious, intentional, wanton and/or reckless, thereby entitling Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request judgment against Defendants for compensatory, presumed, and punitive damages in an amount exceeding the jurisdictional arbitration limits, plus costs, pre- and post-judgment interest, and other further relief as the Court may deem just and proper.

## COUNT IV
### Unjust Enrichment
### (Plaintiffs v. All Defendants)

136.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

137.    Plaintiffs conferred a benefit on Defendants in the form of rights and opportunities to engage in trades of securities in LifeMD.

138.    Defendants appreciated the benefit of being able to buy and sell securities in LifeMD.

139.    Defendants engaged in the aforesaid short-selling scheme, artificially depressing LifeMD's stock price to the detriment of Plaintiffs while accepting and retaining profits from short sales without payment to Plaintiffs or justification.

140.    In this manner, Defendants were unjustly and inequitably enriched at Plaintiffs' expense.

141.    Defendants should disgorge their ill-gotten gains, including profits from short-selling LifeMD stock, and pay over such gains to Plaintiffs.

142.    Alternatively, a constructive trust should be imposed upon such gains and forfeited for disposition as the Court may direct.

WHEREFORE, Plaintiffs respectfully request judgment against Defendants for equitable relief, including an Order that disgorges Defendants' ill-gotten gains exceeding the jurisdictional arbitration limits, including profits from short-selling LifeMD stock, and pays over such gains to Plaintiffs, or alternatively, imposes a constructive trust upon such gains and forfeits them for disposition as the Court directs, plus costs, pre- and post-judgment interest, and other further relief as the Court may deem just and proper.

## COUNT V
**Deceptive Trade Practices – Delaware Uniform Deceptive Trade Practices Act**
**(Plaintiffs v. All Defendants)**

143.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

144.    Defendants, in the course of their business, vocation, or occupation, disparaged the goods, services, or business of Plaintiffs by false or misleading representations of fact.

145.    Similarly, Defendants, in the course of their business, vocation, or occupation, engaged in conduct that created a likelihood of confusion or of misunderstanding with respect to Plaintiffs' goods, services, or business.

146.    Defendants' disparagement and misconduct constitute deceptive trade practices under the Delaware Uniform Deceptive Trade Practices Act, 6 Del. C. §§ 2531, *et seq.*

147.    As a direct and proximate result of Defendants' deceptive trade practices, Plaintiffs were likely to be damaged and are entitled to an injunction under the principles of equity and on terms that the Court considers reasonable. *See* 6 Del. C. § 2533(a).

148.    As a direct and proximate result of Defendants' deceptive trade practices and unfair competition under Delaware common law, Plaintiffs suffered financial and other damages in an amount to be proven at trial and are entitled to treble damages. *See* 6 Del. C. § 2533(c).

149.    As a direct and proximate result of Defendants' willful deceptive trade practices, and because this action is an exceptional case, Plaintiffs are entitled to reasonable attorneys' fees and costs. *See* 6 Del. C. § 2533(b).

WHEREFORE, Plaintiffs respectfully request judgment against Defendants for equitable relief, including an Order that enjoins Defendants' continued publication and use of the false, misleading, defamatory, offensive, and disparaging statements about Plaintiffs; requires

Defendants to retract and remove all such previously published statements; enjoins Defendants' deceptive trade practices; and disgorges Defendants' ill-gotten gains, including profits from short-selling LifeMD stock, and pays over such gains to Plaintiffs, as well as treble damages exceeding the jurisdictional arbitration limits, plus costs, pre- and post-judgment interest, reasonable attorneys' fees, and other further relief as the Court may deem just and proper.

**COUNT VI**
**Unfair Competition – Delaware Common Law**
**(Plaintiffs v. All Defendants)**

150.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

151.    Defendants engaged in misconduct and/or wrongfully interfered with Plaintiffs' reasonable expectancy of entering valid business relationships with contractual partners, investors, bankers, other lenders, and the media, by, among other things, making and publishing false, misleading, defamatory, offensive, and disparaging statements about Plaintiffs.

152.    Defendants' misconduct and/or interference defeated Plaintiffs' legitimate expectancy of these relationships and/or revenue and caused Plaintiffs harm.

153.    Defendants' misconduct and/or interference constitutes unfair competition under Delaware common law.

154.    As a direct and proximate result of Defendants' unfair competition, Plaintiffs suffered financial and other damages in an amount to be proven at trial.

155.    Defendants' unfair competition was willful, malicious, intentional, wanton and/or reckless, thereby entitling Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request judgment against Defendants for compensatory and punitive damages in an amount exceeding the jurisdictional arbitration limits,

plus costs, pre- and post-judgment interest, and other further relief as the Court may deem just and proper.

## COUNT VII
### Conspiracy
### (Plaintiffs v. All Defendants)

156.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

157.    On information and belief: Lamarco, Culper Research, and/or John Does combined to plan and engage in unlawful acts against Plaintiffs at least two months before the Report when they began taking short positions in LifeMD; Defendants aimed to artificially drive down LifeMD's stock price through their unlawful acts and secure a quick and illegal financial windfall; Defendants engaged in making and publishing false statements about Plaintiffs and providing financial, information, and legal support to the conspirator group; and the conspiracy lasted through the publication of the Report and Second Report, and continues to this day in the hope of avoiding legal accountability for its unlawful acts.

158.    Defendants collectively acted with or for the common purpose of, and had a meeting of the minds of, performing unlawful acts against Plaintiffs, including making and publishing false, misleading, defamatory, offensive, and disparaging statements about Plaintiffs (resulting in torts of defamation, trade libel, false light); deceptive trade practices; and unfair competition.

159.    These actions, separately or together, constituted overt acts done in pursuance and furtherance of the common purpose to perform unlawful acts against Plaintiffs.

160.    These actions, separately or together, and the common purpose were undertaken maliciously or with intent to injure Plaintiffs, and without justification.

161.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered financial and other damages in an amount to be proven at trial.

162.    Defendants' conduct was willful, malicious, intentional, wanton and/or reckless, thereby entitling Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request judgment against Defendants for compensatory, presumed, and punitive damages in an amount exceeding the jurisdictional arbitration limits, plus costs, pre- and post-judgment interest, and other further relief as the Court may deem just and proper.

## COUNT VIII
### Aiding and Abetting
### (Plaintiffs v. John/Jane Doe Defendants)

163.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

164.    On information and belief, the Doe Defendants knew that Lamarco and/or Culper Research would or did commit the defamatory, tortious, and unlawful acts described herein.

165.    On information and belief, the Doe Defendants knowingly provided substantial assistance and/or encouragement to Lamarco and/or Culper Research in the commission of the defamatory, tortious, and unlawful acts described herein, including financial, information, and legal support.

166.    On information and belief, the Doe Defendants were aware of their role(s) in these acts at the time they provided substantial assistance and/or encouragement to Lamarco and/or Culper Research.

167.    As a direct and proximate result of the Doe Defendants' conduct, Plaintiffs suffered financial and other damages in an amount to be proven at trial.

- 30 -

168.    The Doe Defendants' conduct was willful, malicious, intentional, wanton and/or reckless, thereby entitling Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request judgment against the Doe Defendants for compensatory, presumed, and punitive damages in an amount exceeding the jurisdictional arbitration limits, plus costs, pre- and post-judgment interest, and other further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  September 17, 2021                    Respectfully submitted,


                                              */s/ Jessica G. Lucas, Esquire*
                                              S. Manoj Jegasothy, Esquire (PA ID No. 80084)
                                              Jessica G. Lucas, Esquire (PA ID No. 311280)
                                              mjegasothy@grsm.com
                                              jlucas@grsm.com
                                              *Counsel for Plaintiffs*

## **VERIFICATION**

I, Justin Schreiber, verify that the facts set forth in this Complaint are true and correct to the best of my knowledge, information, and belief. This statement is made subject to the penalties of Section 4904 of the Crimes Code (18 Pa. Cons. S. § 4904) related to unsworn falsification to authorities.

Dated:  September 17, 2021

_____
Justin Schreiber

## <u>CERTIFICATE OF SERVICE</u>

I, Jessica G. Lucas, Esq., hereby certify that a true and correct copy of the foregoing

(including exhibits) will be served upon the following:

Via Certified U.S. Mail, Restricted Delivery, Return Receipt Requested:

Shadyside Partners, LLC (d/b/a Culper Research)
c/o Harvard Business Services, Inc. (registered agent)
16192 Coastal Hwy
Lewes, DE 19958

Via sheriff:

Christian Matthew Lamarco
3934 Foster Street, B410
Pittsburgh, PA 15201
(for himself and Shadyside Partners, LLC (d/b/a Culper Research))

Dated: September 17, 2021

/s/ *Jessica G. Lucas, Esquire*
Jessica G. Lucas, Esquire

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania:  Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

> Submitted by:  Plaintiffs
>
> Signature:   */s/ Jessica G. Lucas, Esquire*
>
> Name:  Jessica G. Lucas, Esquire
>
> Attorney No.:  311280

# EXHIBIT 1



## Disclaimer

By downloading from or viewing material on this website you agree to the following Terms of Service. Use of Culper Research's ("Culper") research is at your own risk. In no event should Culper or any affiliated party be liable for any direct or indirect trading losses caused by any information on this site. You further agree to do your own research and due diligence, consult your own financial, legal, and tax advisors before making any investment decision with respect to transacting in any securities covered herein. You should assume that Culper (possibly along with or through our members, partners, affiliates, employees, and/or consultants) along with our clients and/or investors has a position in any securities covered herein. Following publication of any research, we intend to continue transacting in the securities covered herein, and we may be long, short, or neutral at any time hereafter regardless of our initial recommendation, conclusions, or opinions. Research is not investment advice nor a recommendation or solicitation to buy securities. To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the securities covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. However, such information is presented "as is," without warranty of any kind – whether express or implied. Culper makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use. Research may contain forward-looking statements, estimates, projections, and opinions with respect to among other things, certain accounting, legal, and regulatory issues the issuer faces and the potential impact of those issues on its future business, financial condition and results of operations, as well as more generally, the issuer's anticipated operating performance, access to capital markets, market conditions, assets and liabilities. Such statements, estimates, projections and opinions may prove to be substantially inaccurate and are inherently subject to significant risks and uncertainties beyond Culper's control. All expressions of opinion are subject to change without notice, and Culper does not undertake to update or supplement this report or any of the information contained herein. You agree that the information on this website is copyrighted, and you therefore agree not to distribute this information (whether the downloaded file, copies / images / reproductions, or the link to these files) in any manner other than by providing the following link — http://www.culperresearch.com The failure of Culper to exercise or enforce any right or provision of these Terms of Service shall not constitute a waiver of this right or provision. If any provision of these Terms of Service is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision and rule that the other provisions of these Terms of Service remain in full force and effect, in particular as to this governing law and jurisdiction provision. You agree that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to use of this website or the material herein must be filed within one (1) year after such claim or cause of action arose or be forever barred.

**EXHIBIT 1**

Culper Research                     LifeMD, Inc. (NASDAQ:LFMD)                     April 14, 2021

## LifeMD, Inc. (LFMD): Redwood Redux at RexMD

We are short LifeMD, Inc. ("LFMD", "the Company", f.k.a. Conversion Labs), as we think that LifeMD is a cash-burning charade which runs afoul of numerous FTC regulations and could suffer the same fate as Redwood Scientific ("Redwood"), which collapsed after facing federal charges. Importantly, LifeMD executives – including CEO Justin Schreiber, CTO Stefan Galluppi, and the Company's two former CFOs – have apparently covered up their involved in Redwood Scientific's "wide ranging fraud", which we think LifeMD now mirrors. Namely, LifeMD appears to use unlicensed doctors to dispense OTC medications, has implemented an autoshipping/autobilling scheme, failed to honor guarantees, and put in place abusive telemarketing practices.

LifeMD's OTC erectile dysfunction ("ED") business touts its use of "Real Doctors" licensed in 46 states, yet lists just 3 doctors on its site. The very first of these doctors is Dr. Roozbeh Badii, whose DEA registration was revoked in October 2020, and who has seen disciplinary actions or suspensions in at least 8 states, including a license suspension in Florida. Not only does this render LifeMD's claims patently false, but potentially leaves the Company liable as an instrument to felony distribution of controlled substances. LifeMD also claimed Dr. Joshua Kalter to be "licensed in California", yet we found no record of Kalter ever being licensed in the state.

In October 2018, Redwood was charged by the FTC for "wide-ranging fraud" which implemented unlawful autoshipping, abusive telemarketing, and false claims of its products. At LifeMD, numerous customer reviews lead us to believe that the Company has implemented the same tactics. LifeMD touts its "recurring revenue" model yet we think much of the Company's revenues are generated under false pretenses of "one-time purchases".

Undisclosed to current LifeMD investors, numerous LFMD insiders were intimately involved in varying aspects of Redwood's "wide ranging fraud." LifeMD CEO Justin Schreiber is listed as agent in Redwood's initial formation materials, and was a significant shareholder. Additionally, both LifeMD's most recent CFO Juan Manual Pinero Dagnery and former CFO Robert Kalkstein were also significant Redwood shareholders. Finally, while LFMD disclosed in 2016 that CTO Stefan Galluppi previously served as Redwood's CTO, this disclosure was removed from Company materials in 2017, and Galluppi omits this "experience" from his LinkedIn biography, effectively covering up involvement from current LifeMD investors.

We find LifeMD's claims to be a "leading telehealth" company flaccid. LifeMD has just 4 software-related employees on LinkedIn, and has capitalized a mere $438,136 in cumulative software development costs. Instead, we think LifeMD and its RexMD brand are best characterized as on a capital-incinerating advertising treadmill. Investors make favorable comparisons to Hims & Hers (HIMS), yet RexMD and Shapiro MD generate an estimated 39.3% and 44.6% of their website visitors from paid search and Facebook vs. just 8.8% for HIMS. We estimate this means RexMD spends over $36 to generate a single visitor to its website, a rate nearly 18 times higher than for HIMS with an acquisition cost just over $2. In Q4 2020, we estimate LFMD spent $18.0 million on RexMD advertising, just for the brand to generate $6.4 million in revenues. We think this venture could easily be replicated for anyone else willing to incinerate capital at such a torrential rate.

Moreover, while investors consider LifeMD a "growth" company, web traffic data show that RexMD visits peaked in December 2020, while traffic data for Shapiro MD has declined precipitously over the past 6 months. LifeMD has yet to report Q1 results, but we don't think this data bodes well for the Company.

That said, this torrential cash burn hasn't stopped LFMD insiders from using the Company as a personal piggy bank. In 2020, $37.0 million in stock compensation was paid to insiders, not to mention numerous related party transactions. CEO Schreiber's father warehouses and fulfills the Company's Shapiro MD shampoo orders, and

Culper Research                    LifeMD, Inc. (NASDAQ:LFMD)                    April 14, 2021

LifeMD paid CEO Schreiber 900,000 shares in 2019 – an exorbitant sum – merely for credit card processing services. We also estimate LFMD pays Schreiber 2x to 3x the prevailing market rent for its Puerto Rico office space, illustrating that Schreiber appears willing to grift shareholders even in the most trivial considerations, by any means possible. We think the Company will need to dilute shareholders further to keep the charade alive.

LFMD CEO Schreiber casts himself as a tech-conscious healthcare executive, yet even apart from his Redwood involvement, he has been involved at several additional effective penny stock "zeroes." Investors in LFMD ought to look to schemes such as Advaxis (ADXS), Clean Coal Technologies (CCTC), Oxis (GTBP), and Cardax (CDXI) to see how Schreiber's tragic comedies tend to unfold.

LFMD's CFO office has been a revolving door with 3 CFOs since March 2019, the most recent of whom departed on April 2, 2021 – just a single day after a tranche of his options vested. LFMD has also cycled through 4 audit firms in the past 5 years, none of whom are "Big 4". We find the stock uninvestible and are short.

## LifeMD Executives Omit "Wide Ranging" Redwood Scientific Fraud from Their Resumes

We are highly concerned that LifeMD executives have not disclosed their involvement in material fraud, namely in Redwood Scientific, prior to their joining LifeMD. We find this especially concerning in light of the business practices we believe are occurring at LifeMD which mirror those that landed Redwood federal charges.

Redwood claimed, in part, to "develop and market consumer homeopathic drugs and supplements … All the company's products are sold either through a membership subscription model (a direct marketing program) or at any given number of retail locations." Redwood even claimed a revolutionary product for erectile dysfunction, just as LifeMD now apparently sells OTC ED pills relying on unlicensed doctors. However, in October 2018, the FTC took notice and prosecuted Redwood for what they called a "wide ranging scheme of fraud and deception."



Furthermore, the Defendants not only executed the fraud at Redwood, but after it was discovered, were found to have lied and obstructed the Courts, hiding their millions in illicit proceeds generated from the scheme. We believe many of these same practices have made their way to LifeMD, where the Company is now subjecting itself to the same risks.

Culper Research                     LifeMD, Inc. (NASDAQ:LFMD)                     April 14, 2021

Apparently unbeknownst to LifeMD investors, at least 4 current and past LifeMD executives were intricately involved at Redwood:

- LifeMD CEO Justin Schreiber was Redwood's own formation agent and incorporator listed in the Redwood's initial Puerto Rico formation documents. He was also a significant shareholder.

- LifeMD CTO Stefan Galluppi was Redwood's CTO. LFMD initially disclosed Galluppi's history with Redwood in its 2016 Form 10-K, yet removed these disclosures in 2017.

- LifeMD former CFO Juan Manual Pinero Dagnery was a significant Redwood shareholder.

- Finally, LifeMD former CFO Robert Kalkstein was a significant Redwood shareholder. LifeMD's investor presentation omits Redwood from Schreiber's, Galluppi's, and Pinero Dagnery's biographies, in our view suggesting a cover-up attempt after the fraud was discovered.[1]

LifeMD's corporate presentation touts its supposed "proven management team" yet the slide conspicuously omits Schreiber and Galluppi's involvement in the Redwood Scientific Fraud:



Despite Schreiber's involvement in Redwood, LifeMD makes just a single reference to Redwood in its 2016 Form 10-K, which discloses Galluppi's involvement as Redwood's CTO:

---

[1] For full primary source evidence of each executive's role, see our appendix at the end of this report.

*Stefan Galluppi, Chief Executive Officer, Immudyne PR*

Stefan Galluppi is the Chief Executive Officer of Immudyne PR and the Chief Operating Officer of Immudyne. Previously, Mr. Galluppi served as CTO at Redwood Scientific Technologies, where he oversaw the information technology infrastructure, ranging from customer services software to Customer Relationship Management (CRM) systems, as well as software system development and integration to streamline the B2C ordering process. Mr. Galluppi was also instrumental in helping create the framework for an optimal back-end office infrastructure to support multiple national TV direct response advertising campaigns rated among the top 10 on the national TV IMS report rankings for performance. Mr. Galluppi's the former co-founder of a NT1 Hosting; a web development, hosting and online marketing firm that design, developed and marketed hundreds of successful websites and campaigns.

However, in the Company's 2017 Form 10-K, the Company has removed all references to Redwood, suggesting, in our view, a cover-up attempt:

*Stefan Galluppi, Former Director and Chief Executive Officer, Immudyne PR*

Stefan Galluppi was the Chief Executive Officer of Immudyne PR and the Chief Operating Officer of Immudyne. Stefan Galluppi is the Chief Executive Officer of Immudyne PR and the Chief Operating Officer of Immudyne. Mr. Galluppi resigned as a Director of Immudyne, Inc. in February 2018 upon the sale of the legacy beta glucan business.

## LifeMD Practices Mirror the Redwood Scientific Fraud

In light of the Company's apparent cover-up of involvement in the "wide-ranging fraud" at Redwood (per the FTC), we are particularly concerned by LifeMD practices which we think mirror those at Redwood. In short, we think LifeMD's business is fatally flawed, unsustainable, and likely to draw regulatory scrutiny, especially in light of Schreiber and Galluppi's histories:

| Redwood Allegations, per the FTC | Culper Research Views on LifeMD |
|---|---|
| "Defendants … bilked consumers out of millions of dollars through baseless advertising claims for products that purport to alleviate serious health conditions… rely on false or unsubstantiated claims…" | LFMD claims its "real doctors" are registered in 46 states, yet the very first doctor touted by RexMD has numerous disciplinary actions and a revoked DEA registration. Dispensing pills without a valid license is a felony offense. |
| "…autoship continuity plans bill consumers monthly for unwanted products… Defendants also make it difficult for consumers to cancel those plans and get their money back." | LFMD touts "ARR from subscriptions" yet we think much of this business originates from autoship programs unbeknownst to customers. |
| "The complaint also alleges that the defendants did not honor their "money-back" guarantee…" | LifeMD offers varying "guarantees" ranging from 60 days to 90 days. Customer reviews allege that these guarantees are not honored. |
| "Defendants have turned to abusive telemarketing practices by delivering prerecorded marketing messages to millions of consumers." | LifeMD product reviews allege a pattern of similar conduct, including abusive marketing phone calls. |

Culper Research                        LifeMD, Inc. (NASDAQ:LFMD)                        April 14, 2021

LifeMD's two core businesses are Shapiro MD (hair loss products at 57% of 2020 product revenues) and RexMD (ED pills and associated products at 42% of 2020 product revenues). We've found highly problematic practices at both Shapiro MD and RexMD.

## RexMD's "Best Physicians" and "Real Doctors" – Meet Dr. Roozbeh Badii

RexMD claims to offer "telemedicine for men", which in practice means generic ED pills are prescribed through doctors over the internet. On the Q4 2020 conference call, CEO Schreiber stated that, "our vision has always been to radically change health care by making access to the best physicians, diagnosis and treatment, easily accessible, convenient and affordable." Perhaps Schreiber has a different definition of "the best physicians", as the very first doctor listed by RexMD – Roozbeh Badii – has had his license to practice suspended or otherwise revoked in several states, including Florida, where the Company still claims he is licensed to practice:



In May 2020, the State of Virginia suspended Badii's license in connection with his failure to cooperate with an investigation of his telemedicine prescribing practices:

> Dr. Badii was licensed by the Board to practice medicine in the State of Maryland on October 17, 2011. His license expired on September 30, 2018.[3] In or around February 2018, the Board initiated an investigation of Dr. Badii, under case number 2218-0147B, following a complaint filed by a pharmacy benefit management organization regarding Dr. Badii's telemedicine prescribing practices. As part of this investigation into Dr. Badii's prescribing practices, the Board issued a subpoena to Dr. Badii for the complete medical records of ten patients and a subpoena to Dr. Badii to appear at the Board for an interview on July 12, 2018. Dr. Badii failed to comply with either subpoena despite numerous requests for the information.[4]

On March 31, 2021, the DEA published notice of the revocation of Badii's DEA registration, following the State of Virginia. The order noted that it is a felony to dispense controlled substances without a current valid license:

6

Culper Research                    LifeMD, Inc. (NASDAQ:LFMD)                    April 14, 2021

> Board of Medicine's decision to suspend Respondent's medical license also means that Respondent is currently without authority to dispense controlled substances under the laws of Virginia. See, *e.g.*, Va. Code Ann. §§ 54.1-2409.1 (2021) (felony to prescribe controlled substances without a current valid license); 54.1-2900 (2021); 54.1-3401 (2021).

- In October 2020, the State of Connecticut suspended Badii's license, characterizing his continued practice as "a clear and immediate danger to the public health and safety."

- In December 2020, the State of Florida suspended Badii's license after having previously placed conditions on his license in November 2017, hence RexMD's claim that Badii is licensed in Florida is false.

- Badii was also reprimanded or placed on probation in Maryland (November 2016), Ohio (February 2017), New York (September 2017), Michigan (March 2018), California (June 2018), and Massachusetts (September 2019).

We question why LifeMD would work with – and even promote – such a doctor in its materials, given Badii's history. This suggests, in our view, that LifeMD is either willfully ignorant of its doctors, or complicit in felonious acts. We're not sure which is worse. Moreover, the fact that this is the very first doctor listed calls into question the doctors which remain unnamed by the Company.

## RexMD Also Appears to Have Falsely Claimed Dr. Joshua Kalter is Licensed in California

Prior to Dr. Badii, a November 2019 archived version of RexMD's website claimed another one of its doctors was Dr. Joshua Kalter, a licensed physician in California:



However, the Medical Board of California shows zero results for any licensed doctors by the name of Joshua Kalter, indicating that Kalter has never in fact held a license in California as claimed by RexMD. Docinfo reports that Dr. Kalter is licensed only in the state of Massachusetts, where a simple Google search also reveals that he resides. We call on LifeMD to disclose a full list of its so-called "fully licensed" physicians who have prescribed drugs for the Company in the past 24 months.

## LifeMD Calls Itself a "A Telehealth Leader"; We Think It's a Direct Marketing Cash Pit

In December 2020, LifeMD (then Conversion Labs) claimed to have launched its "Veritas MD Telehealth Platform", yet we find the press release claims filled with hot air. LifeMD claimed that:

- "Veritas MD integrates patient electronic health records and health care provider workflows across the company's existing telehealth platforms, which includes a 50-state physician network, a leading online pharmacy, and in-house telehealth product development lab."

- "Our official launch of Veritas MD represents the culmination of years of development by experts in technology, medicine, and regulatory affairs," and

- "The state-of-the-art telemedicine technology that forms the foundation of Veritas MD has also transformed the scalability and agility of the company's entire operations."

Back in the real world however, we were unable to find that Veritas MD was even available for public use. We found no associated apps on either the iOS or Android stores, nor could we determine any method by which consumers could sign up for the supposedly "state-of-the-art" telehealth service. Indeed, Veritas MD's website only offers rudimentary graphic depictions of an apparently non-existent app, and a contact form for interested service providers. Per the Q4 2020 conference call in March 2021, the Company now claims Veritas MD is being rebranded and that "we're aiming to launch it this summer." We thus ask the Company under what conditions it felt qualified to issue a press release claiming a "launch" in December 2020. We find the claims indicative of management's willingness to trumpet promotional material while at the same time sweeping uncomfortable truths under the rug.

LifeMD still has just 38 employees on LinkedIn (its annual report claims 56 total employees), only 4 of which we determine to be in technology or software development roles. The Company has capitalized a mere $438,136 in cumulative software development costs, while it the Company's R&D or technology expenses – if it has any – don't rise to the level of disclosure in its financial statements. For reference, Teladoc (TDOC) spent $164.9 million in technology and development expenses in 2020, while American Well (AMWL) spent $84.4 million in research and development in 2020. We find LifeMD's claims to have committed to "years of development" which resulted in a "leading telemedicine business" flaccid.

Instead, we think LifeMD is a cash-burning direct marketing response business. The core driver of Rex MD, the Company's pill-pushing business, is a paid search and web marketing operation which only incinerates more shareholder cash over time. In order to generate traffic to its website, the Company must spend heavily on Facebook and paid search ads. Top keywords include "Viagra online", "generic Viagra", and "Cialis". SimilarWeb indicates that RexMD and Shapiro MD traffic originating from Paid Search and Facebook is multiples higher than for Hims. We estimate that RexMD spent $18.0 million in marketing spend in Q4 2020 alone, almost rivaling Hims despite the Company generating just $6.45 million in revenues compared to $40.1M for Hims:

Culper Research                     LifeMD, Inc. (NASDAQ:LFMD)                     April 14, 2021

| (per SimilarWeb) | Hims | Shapiro MD | RexMD |
|---|---|---|---|
| Traffic via Paid Search & Facebook | 8.8% | 44.6% | 39.3% |
| US Website Rank | 3,873 | 167,589 | 44,690 |
| Total Monthly Visits | 2,870,000 | 45,000 | 165,960 |
| Est. Marketing Spend (Q4 2020) | $19.3M | $2.00M | $18.00M[2] |
| Online Revenues (Q4 2020) | $40.1M | $3.75M | $6.45M |
| Marketing Cost per Website Visitor | $2.24 | $14.81 | $36.15 |

Thus, for each visitor to its site, we calculate RexMD spends over $36, Shapiro MD spends nearly $15, while HIMS spent just over $2. Investors have favorably compared LifeMD to companies such as Hims & Hers (HIMS), yet we think LifeMD is an industry laughingstock in comparison. We think RexMD is easily replicable for anyone willing to recruit shady doctors and light millions in marketing spend on fire each quarter. SimilarWeb shows visits to RexMD peaked in Q4 2020, while visits to Shapiro MD have also fallen significantly over the past 6 months. LifeMD has yet to report its full Q1 2021 results:



---

[2] Prior to RexMD's founding, LifeMD spent ~$2.0M/quarter in sales & marketing. Since RexMD's founding, sales and marketing have ballooned to $20.0M in Q4 2020. Thus, we assign the incremental $18.0M to RexMD.

Culper Research                    LifeMD, Inc. (NASDAQ:LFMD)                    April 14, 2021



## ARR From Subscriptions, Autoshipping, Cancellations, and "Money Back Guarantees"

Apart from the Company's apparent use of unlicensed doctors to dispense pills, we think LifeMD's current business practices mirror the same ones which landed Redwood in hot water. Namely, numerous customer reviews allege that the Company engages in autoshipping, makes cancellations difficult if not impossible, and telephones consumers possibly in violation of TCPA laws.

LifeMD touts its supposed "recurring revenue" generated from subscriptions, which in Q4 2020 amounted to 82% of total Company revenues. On the Company's most recent conference call, CEO Schreiber himself admits to autoshipping, as he states, "it's truly recurring basis every month. It's auto-shipped, auto-charged." This line rings familiar to the one touted by Redwood, which claimed to sell product through a "membership subscription" model. However, just as for Redwood, we think many customers are effectively duped into purchasing subscriptions rather than one-time purchases. See for example a review by "Lady Alopecia"[3] which, even as she compliments the shampoo itself, encourages her readers to order from Amazon, rather than directly from the Company, as it appears "Shapiro is running a kind of scam":

> ## Disclaimer: A word of warning!!
>
> Update Dec 2020: It looks like not ALL reviews are positive after all. I've had two people write to me this week saying that Shapiro MD is running a kind of scam where they a) ship you products you didn't ask for or b) refuse to accept returns and will charge your card anyway. That's why I would advise: DO NOT buy direct from the manufacturer!! Order from Amazon instead – you still get the benefits of the shampoo but without getting signed up for an auto-renew policy. 🙂

See a table of recent Shapiro MD reviews via Sitejabber, a few of which note product purchases through Facebook:

---

[3] Alopecia areata is a condition which causes sudden hair loss in small patches. It affects both women and men.

Culper Research              LifeMD, Inc. (NASDAQ:LFMD)                April 14, 2021

| Date | Review Comments |
|------|-----------------|
| 8/14/2020 | I only ordered once via Facebook. It took nearly a month for the order came then a week later I got automatic charge to my account for the next order which I did not authorize. I tried to call customer service and got no response yet. I'm very frustrated with this company. I just wanted to return all the products and do not want to have any further business with this company. |
| 4/24/2020 | I thought the purchase for 4 months was only 50 some dollars and it came up as 200 and something. Not impressed |
| 2/1/2020 | I simply want to reorder the shampoo and the foam for one month and at every turn you are trying to sell me packages and things I am not interested in. Then I cannot add more than one item to a single order. Your website is designed to boost sales through the creation of customer frustration. It really sucks. |
| 3/2/2020 | I received and used my product for a month. After experiencing increased hair loss the look of greasy hair. I stopped. Called customer service to use the guarantee and was told that because I contacted customer service previously that it voided the guarantee. I am 100% dissatisfied and stuck with three months of your 'product'. I am issuing a complaint to FB. |

Reviews of this kind are not unique to Sitejabber nor to Shapiro MD; see a table of recent RexMD customer reviews via Trustpilot:

| Date | RexMD Review Comments |
|------|-----------------------|
| 4/2/2021 | Signed up for one time prescription and then received a second and they wouldn't refund my money. Don't use Rex MD. |
| 3/29/2021 | Horrible customer service. Appears to be on the edge of being fraudulent DONT BUY ANYTHING FROM THIS COMPANY Took 30 days to get a reply and then only excuses Never received what I ordered Had to go to my credit card and file fraudulent report to get my money back. |
| 3/26/2021 | Thought I'd save some money & take advantage of a Groupon and try RexMD. BIG MISTAKE. Not only did it take a eight days to get the script I was bothered, daily, by erroneous texts telling me to call due to a problem with my order that didn't exist. Finally got my order AND IT WAS THE WRONG SCRIPT! Won't be using again! |
| 3/14/2021 | They don't know how to stop re-occurring payments after you tell them to stop they cost me a overcharge with my bank |
| 3/13/2021 | They did not process my cancellation from December. Forced me to take another delivery. No answer on customer service number. Received email stating they can't stop order even though their tracking number hasn't showed up on USPS. |
| 3/7/2021 | Although they are not legally bound by HIPAA regulations since they don't take insurances, beware they will call your phone and start asking about the medications you have or may consider purchasing from them to whoever answers the phone. Definately a violation of privacy. I won't be using this company! |

Culper Research                    LifeMD, Inc. (NASDAQ:LFMD)                    April 14, 2021

| 3/4/2021 | They will con you and say one time , then charge you saying you signed up for monthly subscriptions .will not refund and will not. clear the issue, you have to dispute and cancel your card "they do fraudulent charges till you finally check your acct." |
|---|---|
| 3/2/2021 | they make it extremely difficult to cancel your subscription ! beware... they say you can go online and cancel but that's not true. you are forced to call the information line- they are keeping my credit card information etc. |

Investors may claim that the majority of reviews are positive, yet we note that reviews are extremely easy to game. For example, one female hair loss blogger has noted Amazon comments that allege Shapiro MD has offered a year of product in exchange for favorable reviews. One Amazon review even states explicitly that "I'm leaving a review so I can get more free product." We further note that many customers may post positive reviews initially upon receiving product, yet are unaware that they have also been enrolled in an autoshipping program. We think that a business whose core strength is built upon customer deception is unsustainable.

## LifeMD CEO Justin Schreiber is a Career-Long Stock Promoter

We believe the practices at LifeMD are set from the top down. To that end, investors ought to realize that CEO Justin Schreiber is a career-long stock promoter. He's apparently attempted to omit this sordid history from investors, but we lay it bare below. We think LifeMD mirrors these past schemes, Schreiber can't be trusted, and LFMD is uninvestible. Schreiber's core entity is JLS Ventures, which claims to "leverage deep capital markets experience and relationships to catalyze portfolio company growth." JLS's website also claims to have "175 employees and growing" and "12 current portfolio companies." We think this 175-employee figure is also totally contrived from thin air; JLS appears to basically be a holding company for Justin Schreiber, and JLS's LinkedIn profile shows just 3 employees, Schreiber being one of them:



JLS Ventures classifies itself as investment management company, but its donut producing acumen puts Krispy Kreme to shame. Just as for the case with LifeMD, we think it's likely that Schreiber has inflated JLS's credentials. Not only that, but Schreiber again omits the Company's failures, as an archived version of the website lists several logos which have since been removed:

Culper Research                LifeMD, Inc. (NASDAQ:LFMD)                April 14, 2021



In our view, these logo removals suggest that JLS wishes to distance itself from the subsequent blow-ups that Schreiber arguably aided and abetted. In July 2014, Advaxis, an immunotherapy company, paid JLS $4 million in stock for "investor relations services."



Clean Coal Technologies was another spectacular blow-up in which President Douglas Hague was arrested by the DOJ and charged with kickbacks to a third party who bought Clean Coal's restricted stock at inflated prices:

13

Culper Research                LifeMD, Inc. (NASDAQ:LFMD)                April 14, 2021



Oxis touted a cancer drug before imploding and renaming itself GT Biopharma (GTBP):



Finally, in February 2014, JLS owned Cardax (OTC:CDXI) through common stock and warrants which it received in exchange for "consulting services":

Culper Research                        LifeMD, Inc. (NASDAQ:LFMD)                        April 14, 2021



## At LifeMD, Insiders Win While Common Shareholders Lose

Despite the Company's torrential cash burn, insiders have collected healthy paychecks. From 2019 to 2020, G&A expenses (separate from selling and marketing expenses) went from $2.4 million to $42.2 million. Footnotes indicate that stock-based compensation for the year was an astounding $37.0 million, almost matching the Company's $37.3 million in total revenues. This sheer level of insider enrichment concerns us, given Schreiber's propensity to participate in stock promotion schemes in which common shareholders are left holding the bag.

Stock awards aside, insiders have enriched themselves via related-party transactions. For example, LifeMD pays BV Global Fulfillment, apparently owned by Justin Schreiber's father Brian, both monthly fees and "direct costs" associated with shipping Company product:



LifeMD's Form 10-K indicates that its Puerto Rico offices – consisting of just 1,000 square feet – were leased from JLS Ventures (Justin Schreiber's entity) with annual rent payments of $52,000 in 2019 and $45,000 in 2020. At $45 per square foot, we estimate LFMD is paying Schreiber 2x to 3x comparable market rents. See Class A space available here at $21/sqft, an office park here at $18/sqft, suburban space here at $12/sqft, and finally here at $18/sqft. In effect, Schreiber and his cronies appear willing to grift shareholders by any means possible.

The Company's 2019 Form 10-K also indicates that JLS Ventures earned an astounding 900,000 shares for providing credit card processing services to the Company, yet these disclosures have been removed in the Company's 2020 Form 10-K. We remain unclear as to whether this was due to a change in service providers or if LifeMD is merely once again selectively disclosing negative information to investors.

Perhaps these questions were the same ones asked by LFMD's auditors, which tally 4 in the past 5 years, or CFO's, of which there have been 3 since March 2019. CFO Juan Manual Pinero Dagnery departed most recently in April 2021, while each auditor has expressed going concern warnings for LFMD:

| Year | Firm Name | Audit Partner | Location |
|------|-----------|---------------|----------|
| 2016 | PKF O'Connor Davies, LLP | George Arthur Whitehead | New York, NY |
| 2017 | Rosenberg Rich Baker Berman, P.A. | Daniel Arnold Brown | Somerset, NJ |
| 2018 | B F Borgers CPA PC | Ben F Borgers | Lakewood, CO |
| 2019 | B F Borgers CPA PC | Ben F Borgers | Lakewood, CO |
| 2020 | Freidman LLP | Justin Van Fleet | Marlton, NJ |

It's worthwhile to note that ex-CFO Dagnery resigned from the Company just a single day after his second tranche of options vested, suggesting that he was looking to "take his money and run." See per his original employment contract that Dagnery received a package by which 166,667 options would vest on April 1 each year:

> "Subject to the Employee remaining an employee of the Company, the Options shall vest in three equal installments. For the avoidance of doubt, 166,667 options shall vest on April 1, 2020, 166,667 options shall vest on April 1, 2021, and 166,666 options shall vest on April 1, 2022."

In his departure agreement, the Company explicitly noted that he would be paid out:

> "Options: The time-based option to purchase 166,667 (33,333.4 shares post 5-for-1 reverse stock split) of common stock of LifeMD at an exercise price of $0.23 ($1.15 post 5-for-1 reverse stock split) held by you on the Termination Date that are scheduled to vest on April 1, 2021 will be deemed vested and not subject to forfeiture as of the Termination Date."

## Appendix: LifeMD Has Hidden Past Involvement in Redwood Scientific

## CEO Schreiber was Redwood's Formation Agent and a Significant Shareholder

Culper Research                    LifeMD, Inc. (NASDAQ:LFMD)                    April 14, 2021

Puerto Rico's corporate registry indicates that Schreiber himself was Redwood's Resident Agent and Incorporator. Redwood also lists addresses at 53 Palmeras Street ("The Caribe Office Building"), 8th Floor. This address is shared by LFMD's Puerto Rico subsidiaries:

## General Information

| Name | REDWOOD SCIENTIFICTECHNOLOGIES PR INC. | | |
|---|---|---|---|
| Register No. | 369671 | Status | CANCELLED |
| Formation Date | 09-Mar-2016 4:31 PM | Effective Date | 09-Mar-2016 4:31 PM |
| Expiration Date | Does not expire | Termination Date | 21-Dec-2018 12:01 AM |
| Class | Corporation | | |
| Type | For Profit | Jurisdiction | Domestic |

## Designated Office Address

| Street Address | Caribe Office Building, 8th Floor 53 Palmeras Street SAN JUAN, PR 00901 | Mailing Address | Caribe Office Building, 8th Floor 53 Palmeras Street SAN JUAN, PR 00901 |
|---|---|---|---|

## Resident Agent

| Name | Schreiber, Justin L | | |
|---|---|---|---|
| Street Address | Caribe Office Building, 8th Floor 53 Palmeras Street SAN JUAN, PR 00901 | Mailing Address | Caribe Office Building, 8th Floor 53 Palmeras Street SAN JUAN, PR 00901 |

## Officers

| Name / Title(s) | Street Address | Mailing Address |
|---|---|---|
| Cardiff, Jason (President) | Caribe Office Building, 8th Floor, 53 Palmeras Street, SAN JUAN, PR, 00901 | Caribe Office Building, 8th Floor, 53 Palmeras Street, SAN JUAN, PR, 00901 |

## Incorporators

| Name | Street Address | Mailing Address |
|---|---|---|
| Schreiber, Justin L | Caribe Office Building, 8th Floor, 53 Palmeras Street, SAN JUAN, PR, 00901 | Caribe Office Building, 8th Floor, 53 Palmeras Street, SAN JUAN, PR, 00901 |

## Stocks

| Class | Number | Par Value |
|---|---|---|
| Common | 1,000 | $1.00 |

## Purpose

Company develops and markets FDA registered over the counter drugs that address unmet needs.

17

Culper Research                LifeMD, Inc. (NASDAQ:LFMD)                April 14, 2021

In Redwood's Form S-1 filed in 2016, significant shareholders include an entity named "JP Global" located at the same address – 53 Calle Palmeras Street:

(38) Consists of 114,689 Shares of Common Stock, 105,000 Shares of Common Stock underlying Series A Warrants and 1,599 Shares of Common Stock underlying additional warrants due to anti-dilution provisions of the Bridge Notes. The person having voting, dispositive or investment power over JP Global is Georgianne Ocasio. The address for JP Global is 53 Calle Palmeras 8th Floor, San Juan, Puerto Rico, 00901.

The footnote states that Georgianna Ocasio has voting power over JP Global, while Ocasio's LinkedIn profile states that from January 2014 to December 2017, she was Director of JLS Ventures, LLC, of which Justin Schreiber is founder and president:



We think this to be a thinly-veiled layer over Schreiber's involvement, none of which has been disclosed to current LifeMD investors.

## Former CFO Pinero Dagnery (February 2021) was a Significant Redwood Shareholder

We also find that former LifeMD CFO was a significant Redwood shareholder through "802 Investments LLC" which was also located at the Caribe Office Building:

| Name of Selling Stockholder | Number of Shares of Common Stock Owned Prior to Offering(1) | Maximum Number of Shares of Common Stock to be Sold Pursuant to this Prospectus (2) | Number of Shares of Common Stock Owned After Offering (3) |
|---|---|---|---|
| 802 Investments LLC (4) | 165,668 | 165,668 | 0 |

(4) Consists of 110,445 Shares of Common Stock and 55,223 Shares of Common Stock underlying Series B Warrants. The person having voting, dispositive or investment power over 802 Investments LLC is Juan M. Pinero Dagnery. The address for 802 Investments LLC is 53 Calle Palmeras Ste 802, San Juan, Puerto Rico, 00901.

## Former CFO Kalkstein (March 2019) was a Significant Redwood Shareholder

The same goes for former LifeMD CFO Robert Kalkstein, who owned shares through "Generous Limestone LLC", also located at the Caribe Office Building:

(23) Consists of 27,460 Shares of Common Stock and 25,000 Shares of Common Stock underlying Series A Warrants and 380 Shares of Common Stock underlying additional warrants due to anti-dilution provisions of the Bridge Notes. The person having voting, dispositive or investment power over Generous Limestone LLC is Robert Kalkstein. The address for Generous Limestone LLC is 53 Calle Palmeras 6th Floor, San Juan, Puerto Rico, 00901.

# EXHIBIT 2



## Disclaimer

By downloading from or viewing material on this website you agree to the following Terms of Service. Use of Culper Research's ("Culper") research is at your own risk. In no event should Culper or any affiliated party be liable for any direct or indirect trading losses caused by any information on this site. You further agree to do your own research and due diligence, consult your own financial, legal, and tax advisors before making any investment decision with respect to transacting in any securities covered herein. You should assume that Culper (possibly along with or through our members, partners, affiliates, employees, and/or consultants) along with our clients and/or investors has a position in any securities covered herein. Following publication of any research, we intend to continue transacting in the securities covered herein, and we may be long, short, or neutral at any time hereafter regardless of our initial recommendation, conclusions, or opinions. Research is not investment advice nor a recommendation or solicitation to buy securities. To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the securities covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. However, such information is presented "as is," without warranty of any kind – whether express or implied. Culper makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use. Research may contain forward-looking statements, estimates, projections, and opinions with respect to among other things, certain accounting, legal, and regulatory issues the issuer faces and the potential impact of those issues on its future business, financial condition and results of operations, as well as more generally, the issuer's anticipated operating performance, access to capital markets, market conditions, assets and liabilities. Such statements, estimates, projections and opinions may prove to be substantially inaccurate and are inherently subject to significant risks and uncertainties beyond Culper's control. All expressions of opinion are subject to change without notice, and Culper does not undertake to update or supplement this report or any of the information contained herein. You agree that the information on this website is copyrighted, and you therefore agree not to distribute this information (whether the downloaded file, copies / images / reproductions, or the link to these files) in any manner other than by providing the following link — http://www.culperresearch.com The failure of Culper to exercise or enforce any right or provision of these Terms of Service shall not constitute a waiver of this right or provision. If any provision of these Terms of Service is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision and rule that the other provisions of these Terms of Service remain in full force and effect, in particular as to this governing law and jurisdiction provision. You agree that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to use of this website or the material herein must be filed within one (1) year after such claim or cause of action arose or be forever barred.

EXHIBIT 2

Culper Research                    LifeMD Inc. (NASDAQ:LFMD)                    May 27, 2021

## LifeMD Inc. (LFMD): Another Series of "Unfortunate" Events

---

*"Tell me with whom you associate, and I will tell you who you are."*

*– Johann Wolfgang von Goethe*

---

LifeMD's response to our initial report sought to distance CEO Justin Schreiber from Redwood Scientific by characterizing his involvement as an "unfortunate investment", as if to characterize Redwood as a black spot on an otherwise illustrious investment history. However, our report also detailed Schreiber's history of involvement in several businesses we view as stock promotion schemes, including Advaxis (ADXS), Clean Coal Technologies (CCTC), Oxis (now GTBP), and Cardax (CDXI). These were left unaddressed in the Company's response.

What we find even more egregious is Schreiber's involvement in Blockchain Industries Inc (OTC:BCII), a $36 million OTC-traded penny stock which claims to be "a merchant bank which focuses on the international blockchain and cryptocurrency sectors." Schreiber bought the shell (formerly known as Omni Global Technologies) through JOJ Holdings in May 2017, and renamed it Blockchain Industries. In further testament to Schreiber's tendency towards "unfortunate" decision-making, BCII has utilized the "legal" services of Richard Rubin, a disbarred attorney who was not allowed to practice law. See a February 2018 BCII filing in which Schreiber is listed as 98% owner of BCII through JOJ Holdings, while Rubin is listed as legal counsel:

If any of the beneficial shareholders are corporate shareholders, provide the name and address of the person(s) owning or controlling such corporate shareholders and the resident agents of the corporate shareholders.

| Name and Address of Beneficial Owners | Number of Shares | Percentage Ownership (1) |
|---|---|---|
| JOJ Holdings, LLC, 53 Calle Palmeras, San Juan, Puerto Rico 00901 | 40,000,000 | 98.19% |
| **Total** | **40,000,000** | **98.19%** |

(1) Based upon 40,737,406 shares of common stock issued and outstanding on February 12,2018. The control person of JOJ Holdings LLC is Justin Schreiber, the married spouse of Olivia Funk, the former CEO and sole director of the Company. Reference is made to the Company's Form 8-K filed with the SEC on November 16, 2017 reporting the resignation of Olivia Funk and the appointment of Patrick Moynihan as CEO and sole director. https://www.sec.gov/Archives/edgar/data/1084370/000168316817003065/blockchain_8k.htm

Please provide the name, address, telephone number, and email address of each of the following outside providers that advise your company on matters relating to operations, business development and disclosure:

Legal Counsel
Name: **Office of Richard Rubin**
Firm:
Address 1: **40 Wall Street, 28th Floor**
Address 2: **New York, NY 10005**
Phone: **917-957-9092**
Email: **rrubin@parkavenuegorup.us**

In December 2020, Rubin was charged by the SEC for his role in "a legal opinion letter scheme to fraudulently facilitate the sale of millions of shares of microcap securities to retail investors." Per the SEC's complaint, Rubin was not actually a practicing attorney, having been disbarred in 1995:

## SEC Charges Disbarred New York Attorney and Florida Attorney with Scheme to Create False Opinion Letters

**FOR IMMEDIATE RELEASE**
**2020-300**

*Washington D.C., Dec. 2, 2020* — The Securities and Exchange Commission today charged disbarred attorney, Richard J. Rubin, and licensed attorney, Thomas J. Craft, with fraud for their roles in a legal opinion letter scheme to fraudulently facilitate the sale of millions of shares of microcap securities to retail investors.

The SEC's complaint alleges that from December 2015 to July 2018, Rubin, who was disbarred in 1995, continued to fraudulently practice securities law by submitting at least 128 attorney opinion letters that allowed microcap stock issuers' securities to be purchased by and sold to the investing public. The complaint alleges that Rubin signed certain letters, falsely claiming to be an attorney, and that he drafted other letters for Craft's signature. The complaint alleges that Craft signed or permitted the use of his name and signature on at least 30 letters that falsely stated he had performed substantive work to formulate the opinions in those letters.

We think that if BCII was a fully-legitimate operation, then at the least, it would be able to recruit a legitimate lawyer. Apparently, this was not the case.

Moreover, in November 2017, Patrick Moynihan joined BCII as CEO and CFO, replacing none other than Schreiber's wife, Ms. Olivia Funk. Moynihan was previously a member of Redwood Scientific's Board of Directors. In May 2018, Robert Kalkstein, then also joined BCII as CFO before he went on to join LFMD as CFO.

The following sets forth biographical information about each of our directors and executive officers as of the date of this report:

| Name | Age | Position | Director / Officer Since |
|------|-----|----------|--------------------------|
| Patrick Moynihan | 50 | Former Chief Executive Officer | November 15, 2017, resigned as Chairman of the Board on April 7, 2019. Resigned as Chief Executive Officer on June 17, 2019 |
| Paul Kim | 49 | Interim Chief Executive Officer and Chief Operating Officer | June 4, 2019 (COO) and June 14, 2019 (Interim CEO) |
| Robert Kalkstein | 37 | Principal Financial Officer | May 18, 2018 |
| Max Robbins | 47 | Director | February 1, 2018 |
| Richard Kromka | 53 | Director | December 30, 2018 |
| Michael Conn | 40 | Director | December 30, 2018 |
| Kevin Hu | 25 | Director | December 30, 2018 |

As our initial report detailed, Kalkstein was also previously a shareholder at Redwood Scientific. **As shown through these further connections, it appears to us that Schreiber, Stefan Galluppi (see below), Moynihan, and Kalkstein**

**were not only involved at Redwood Scientific, but yet another alleged fraud in Blockchain Industries. In our view, these ties cause us to question whether Schreiber and his lackeys are merely in the business of moving from one stock scheme to another, leaving a wake of shareholder losses in their path.**

In 2018, the entirety of BCII's revenues were generated from an agreement to provide "ICO services" to PT KinerjaPay Indonesia (OTC:KPAY) in exchange for $250,000 in cash and 1.0 million KPAY shares worth $1.8 million:

> *Years Ended April 30, 2018 and 2017*
>
> *Service Revenue*
>
> Revenue was $1,582,483 and $0 for the year ended April 30, 2018 and 2017, respectively. As aforementioned, the Company was under the control of a Court appointed Receiver during the 2017 period. For the period ended April 30, 2018 the Company primarily focused on generating revenue from the Digital Asset market. The revenue recorded during this period relates to (1) the agreement it signed with KPAY for ICO consulting services and (2) the conference held in San Juan, Puerto Rico on March 2018.
>
> Under the terms of the agreement with the customer, the value of the contract was comprised of $250,000 in cash and 1,000,000 shares of stock valued at $1.80 per share, or $1,800,000, and was paid in full to the Company prior to the commencement of services. The total value of the contract was $2,050,000. The Company or customer may

Today, KPAY trades at $0.0043 per share, or 99.76% lower than those levels. When we looked for any evidence of these "ICO services", we were unable to find any record of Kinerjapay's "KCOIN" trading on any cryptocurrency exchanges. KPAY stated in its Q3 2018 Form 10-Q that the company decided "not to proceed" with the ICO:

> *Inventories*
>
> Inventories are stated at the lower of cost or market value, using the first-in, first-out convention. Inventories consist of raw materials in the form of coins and finished goods, such as instant noodles for sale. The gold-plated coins were manufactured in connection with the far-future plan of coin offerings and supposed to be distributed at the first launch of the coin offering. However, the Company has determined not to proceed at this time with the previously announced coin offering and may, in fact, abandon the coin offering. As of September 30, 2018, and December 31, 2017, the Company had inventories of $24,311 and $0, respectively.

Coupled with what we view as Schreiber's tendency to surround himself in failing businesses as investors' expense, BCII also awarded several grants to many of the same individuals we mentioned in our initial report:

- **Current LifeMD CTO and former Redwood Scientific CFO Stefan Galluppi was granted 500,000 shares at $0.2595 per share, despite – as far as we can tell – having no official executive role at BCII.**

- Robert Kalkstein was granted 500,000 shares at $3.50. Moreover, Sagacious Gambit Inc. (a Robert Kalkstein-affiliated entity per state records and BCII's filings), was granted 500,000 shares at $2.50.

- Lisa Moynihan (who we suspect is related to Patrick Moynihan) was granted 100,000 shares at $14.00.

Moreover, LifeMD itself, which was formerly known as Immudyne prior to its rebranding to Conversion Labs, then LifeMD, also became directly involved with BCII in November 2017 through a transaction wherein the company purchased BCII shares from JOJ Holdings (a Justin Schreiber entity) in exchange for its own shares:

Culper Research                LifeMD Inc. (NASDAQ:LFMD)                May 27, 2021

> On November 20, 2017, the Company entered into an agreement (the "Agreement") with JOJ Holdings, LLC ("JOJ"). Pursuant to the terms of the Agreement, Immudyne purchased 2,000,000 shares (post-split from a 2:1 forward split on January 16, 2018) of Blockchain Industries, Inc. ("BCII") from JOJ. The Agreement was amended on December 8, 2017 and again on March 9, 2018. In consideration for the purchase, Immudyne agreed to issue one (1) share of Immudyne common stock to JOJ for every dollar Immudyne realizes from gross proceeds on the sale of shares of BCII purchased pursuant to the Agreement, up to a total maximum aggregate amount of 5,000,000 shares. The Company has 3 years to sell the shares of BCII and has agreed not to sell more than 20% of the 30-day average daily trading volume of BCII. Justin Schreiber, the Company's President and CEO, is the President and owner of JOJ. The transaction was determined not to meet the criteria for recognition as an exchange transaction, therefore no asset or liability has been recorded in the financial statements.

Readers may ask, "why was Immudyne/LifeMD – whose primary products at the time were Shapiro MD shampoo and conditioners – become involved in the CEO's apparent cryptocurrency side hustle?" We don't have a great answer for that. Nevertheless, we don't think this venture has resulted particularly well for shareholders thus far:



LifeMD investors may also be interested to know that Schreiber and BCII appear to hold ties to two additional unsavory individuals, according to a lawsuit. These include:

- **Murray Huberfeld**, alleged fraudster and co-Founder of Platinum Partners, whose collective legal proceedings remain ongoing but include charges of securities fraud, conspiracy, wire fraud, and more.

- **Joseph Salvani**, who was alleged by the SEC to have induced the purchase of securities without registering as a broker, and further characterized by Forbes as a "master [stock] tout".

A February 2021 lawsuit filed against Schreiber (case 3:21-cv-00242-W-DEB) alleges that the plaintiff was unjustly terminated in connection with his investigations of fraudulent activity at BCII.

In the suit, former BCII employee Daniel White also named former LFMD CFO Robert Kalkstein and others including Joseph Salvani. Joseph Salvani was charged by the SEC for selling securities without a broker's license, and called a "master tout" by Forbes. Thus, we find his alleged co-involvement in BCII to be particularly concerning.

The White complaint alleges that in January 2018, White was hired by BCII as Head of Security and promoted to "Integrity Compliance Officer" thereafter. In October 2018, White was tasked with conducting an internal

Culper Research                    LifeMD Inc. (NASDAQ:LFMD)                    May 27, 2021

investigation at BCII, and, as the complaint alleges, "became aware of various misdeeds", including that "[BCII's] capitalization table had been fraudulently tampered with."

| 6 | 33.   In or around November of 2018, Plaintiff determined through his investigation |
|---|---|
| 7 | |
| 8 | that Defendant Blockchain's capitalization table had been fraudulently tampered with. |
| 9 | 34.   Defendant Blockchain's capitalization table illustrated that Mr. Murray |
| 10 | Huberfeld was one of Defendant Blockchain's seed investors without any KYC (Know |
| 11 | Your Customer) analysis or any AML (anti-money laundering) processes or procedures. |
| 12 | |

More specifically, White claims that Murray Huberfeld (who previously pled guilty to conspiracy in relation to the Platinum Partners fraud) disappeared from the capitalization table, while at the same time, Kalkstein (former LFMD CFO), Schreiber, and Schreiber's wife (Olivia Funk), all back-dated preferred stock issuances:

| 25 | 46.   In or around November of 2018, Defendant Moynihan informed Plaintiff that |
|---|---|
| 26 | |
| 27 | Defendant Kalkstein, Defendant Schreiber, and Mr. Schreiber's wife (Olivia Funk) had |
| 28 | back dated preferred stock issues in late of 2017 at the same time that Mr. Murray |

PLAINTIFF'S COMPLAINT FOR DAMAGES
10

| 1 | Huberfeld's shares had disappeared from Defendant Blockchain's capitalization table. |
|---|---|
| 2 | 47.   Plaintiff investigated this matter. He questioned Defendant Kalkstein and |
| 3 | |
| 4 | Defendant Schreiber—both of whom refused to comply with Plaintiff's investigation and |
| 5 | failed to provide documentation regarding the issuance of shares in Defendant Blockchain. |

White's complaint also claims that he investigated Schreiber and Salvani's nominees to the BCII board, Douglas Cole and Douglas MacLellan. Per the complaint, each Cole and MacLellan were executives at Oroplata (ORPP), now American Battery Metals Corp (ABML), which itself "was part of a separate microcap fraud investigation." White claims that Schreiber and Salvani submitted fraudulent biographies on their behalf:

> 48.     In or around November of 2018, Defendant Moynihan tasked Plaintiff with conducting a comprehensive background investigation on Mr. Douglas Cole and Mr. Douglas MacLellan, who were both nominated to the Board of Directors of Defendant Blockchain by Defendant Salvani and Defendant Schreiber.
>
> 49.     Plaintiff's investigation revealed that both Mr. Douglas Cole and Mr. Douglas MacLellan were also executives for a company named Oroplata (ORRP) that was part of a separate microcap fraud investigation.
>
> 50.     Plaintiff's investigation further revealed that both Defendant Salvani and Defendant Schreiber submitted fraudulent biographies on behalf of Mr. Cole and Mr. MacLellan to Defendant Blockchain during the Board of Directors nomination process.
>
> 51.     Plaintiff reported not only the fraudulent information contained in the biographies, but also Defendant Salvani and Defendant Schreiber's conduct and conflict of interests with Mr. Cole and Mr. MacLellan to Defendant Blockchain's Board of Directors.

Per the complaint, after White brought these findings – which involved Schreiber's "violation of state and federal statutes, rules, and regulations for his own personal benefit" – to light, Schreiber directed the board to terminate White. We view this as "unfortunate" indeed:

> 53.     On December 22, 2018, Defendant Kalkstein, Defendant Schreiber, and Defendant Salvani all sought the immediate termination of Plaintiff from his employment with Defendant Blockchain. That same day, Defendant Salvani messaged a shareholder of Defendant Blockchain, stating that he was going to "take Brennan [Plaintiff] down."

> 65.     It was Plaintiff's understanding that Defendant Schreiber did not wish to have Plaintiff reviewing actions of shareholders so that Defendant Schreiber could continue to violate state and federal statutes, rules, and regulations for his own personal benefit.

> 70.   On April 15, 2019, Plaintiff is notified by Defendant Moynihan that the Board of Directors of Defendant Blockchain ordered him to terminate Plaintiff's employment.
>
> 71.   Defendant Moynihan indicated to Plaintiff that the Board of Directors ordered him to terminate Plaintiff's employment due to the direct demand of Defendant Schreiber.

Furthermore, per the complaint, White filed formal complaints with the SEC, the Equal Employment Opportunity Commission, and the California Department of Industrial Relations:

> 66.   On April 5, 2019, Plaintiff sent email correspondence to Defendant Schreiber and to the Board of Directors of Defendant Blockchain in order to provide notice that Plaintiff had filed formal complaints with the SEC.

> 73.   Plaintiff was formally terminated by Defendant Blockchain on April 15, 2019.
>
> 74.   On that same date, April 15, 2019, Defendant Hu proceeded to delete Plaintiff's company email, despite having received a formal written demand from Plaintiff to preserve all electronically stored information, upon Plaintiff's information and belief.
>
> 75.   As a result of the misconduct that Plaintiff uncovered during his internal investigation, and due to Defendant Blockchain's improper employment practices, Plaintiff filed formal complaints with the Equal Employment Opportunity Commission ("EEOC") and the California Department of Industrial Relations ("DIR") on April 19, 2019.

> 76.   On June 2, 2019, Defendant Blockchain agreed to settle with Plaintiff in exchange for the release of Plaintiff's claims against the company. Defendants drafted the "Settlement and Release Agreement" (the "Agreement") (Attached hereto as **Exhibit A**).

BCII offered to settle, and while White agreed to the terms, White's suit claims that BCII never in fact fulfilled its end of the settlement agreement, and never paid White in full. White's complaint further alleges that Schreiber himself admitted that BCII never intended to honor the settlement:

| 1  | 76.    On June 2, 2019, Defendant Blockchain agreed to settle with Plaintiff in |
|----|---|
| 2  | exchange for the release of Plaintiff's claims against the company.  Defendants drafted the |
| 3  | "Settlement and Release Agreement" (the "Agreement") (Attached hereto as **Exhibit A**). |
| 4  | |

| 24 | 91.    On or around August 13, 2019, Defendant Schreiber wrote Plaintiff an email |
|----|---|
| 25 | in which he indicated Defendant Blockchain did, in fact, intend to violate the Agreement. |

We remind investors that the lawsuit remains ongoing, yet the allegations remain highly concerning to us in light of Schreiber's continued role as CEO of LifeMD. We question why Schreiber finds himself involved in such proceedings in the first place – proceedings which also name federally-charged Murray Huberfeld and SEC-charged Joseph Salvani.

## Corey Deutsch, LifeMD "Chief Business Officer" and Stock Tout

Similarly, we are of the view that if LifeMD were a fully-legitimate operation, then the Company wouldn't have to rely on the services of its Chief Business Officer, Corey Deutsch, to promote LFMD in various forums. LifeMD's April 16 response to our report claimed that:

> "After producing rapid growth, we met some of the world's most sophisticated institutions and advisors, who conducted countless hours of due diligence before investing in the Company."

Despite this lofty-sounding claim, NASDAQ reports that just 18% of the Company is owned by institutions. Indeed, we think that "the world's most sophisticated institutions" have overwhelmingly turned their backs on LifeMD. Instead, LifeMD has relied upon Corey Deutsch, who not only appears to be LifeMD's largest outside investor, but is now employed by LifeMD to apparently tout the stock to retail investors. See Deutsch below:

Culper Research                    LifeMD Inc. (NASDAQ:LFMD)                    May 27, 2021





In addition to his role(s) as Chief Business Officer / Corporate Development at LifeMD, Deutsch lists himself as principal of "Paradigm Opportunities", and filed a Form D (exempt offering) for Paradigm Opportunities SPV 1, LP on October 28, 2020. To us, designating the vehicle as an SPV suggests a vehicle meant primarily to back LifeMD's private placement, which occurred 6 days later. To that end, LifeMD's associated press release named Deutsch as a lead investor in this placement. In the Company's November 25, 2020 registration statement just 3 weeks later, Paradigm Opportunities was listed as the Company's single largest selling shareholder.

On December 3, 2020, just 8 days later, Deutsch entered into a consulting agreement with LifeMD upon which he received options for 75,000 shares. Then on December 19, 2020, Deutsch registered a StockTwits account then named "CVLBCorpDev", which then promoted LFMD stock with an explicit focus on retail investors. We think that if LifeMD were capable of attracting "the world's most sophisticated institutions", then the Company would have little reason to pump its stock in this manner:

Culper Research                     LifeMD Inc. (NASDAQ:LFMD)                     May 27, 2021

**CVLBCorpDev**   `Bullish`  12/19/20, 01:20 PM                                    •••

@Dude24 I would argue that the business has not had any blips at all. How the
stock performs short-term / week to week is not in our control, but how the
Company executes is. We had a record month in November and continue to
grow at a triple-digit rate.

We would prefer to stay away from stock-related questions given we don't have
control of how it performs, that being said, we take the view point it is not if our
market cap reaches a level reflective of our profile, but rather when.

I'll share my view point on the stock performance just this once. The stock had
been trading on a highly illiquid OTC exchange up until last week. The stock has
also increased 1000% in the last year. I'd imagine there were a lot of early
investors in the stock that saw $10,000 turn to $100,000 in a year but did not
have the opportunity to sell given the lack of volume on the OTC. These
individuals are likely taking chips off the table, which ultimately means there
are being replaced with new investors

**CVLBCorpDev**  12/27/20, 09:44 AM                                              •••

@seemslogical Not sure precisely what you would be reporting - looking
forward to the session!



Culper Research                  LifeMD Inc. (NASDAQ:LFMD)                  May 27, 2021



LifeMD apparently found Deutsch's "consulting" services worthwhile, and brought him into the fold as Head of Corporate Development on February 3, 2021. Nevertheless, in what we now find an extremely problematic decision, even as an executive of LifeMD, on February 10, 2021, "Paradigm Opportunities" – i.e. Corey Deutsch – posted a Seeking Alpha puff piece entitled "Conversion Labs: If You're Not Yet A Believer, You Will Soon Be Converted." The stock traded at $28.14 at the time:



We find Deutsch's Seeking Alpha puff piece additionally problematic in that he does not disclose that his role as LifeMD's current Head of Corporate Development, only his long position in the stock:

**Disclosure:** I am/we are long CVLB.

See as compared to a separate Seeking Alpha disclosures, which we find references potential business relationships between the author and the subject company:

Culper Research                    LifeMD Inc. (NASDAQ:LFMD)                    May 27, 2021

**Disclosure:** I/we have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72 hours. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.

Paradigm Opportunities' Seeking Alpha profile does not mention Deutsch by name, nor does it disclose that he is an executive at LifeMD. On the other hand, Deutsch's Company-provided biography uses the past tense to state that "Prior to joining LifeMD, he founded and served as CIO of Paradigm Opportunities…" However, it appears to us both that (1) Deutsch has promoted LifeMD stock while working directly as an executive of the Company, and (2) Deutsch continues to run Paradigm Opportunities. In our view, companies with a legitimate story to tell investors don't usually need to recruit their "sophisticated shareholders" to serve as stock touts.

Corey Deutsch is apparently not the only Deutsch invested in LifeMD. On February 11, 2021, self-described lower middle market private equity firm Deutsch Capital announced its investment in Conversion Labs / LifeMD at $23 per share in connection with LFMD's private placement:

**White Plains, New York — February 11, 2021** – Deutsch Capital LLC today announced an investment in Conversion Labs, Inc. (NASD: CVLB). Conversion Labs is a leading direct-to-patient telehealth company. Deutsch Capital's investment was part of a $14 million unregistered private placement to certain individuals and institutions at $23 per share. Proceeds from the offering will be used in conjunction with the roll out of Life MD and to further expand the company's telehealth pipeline.

The President and Founder of Deutsch Capital is Mark Deutsch, who we suspect is related to Corey Deutsch. Since Deutsch Capital's February 11, $23 per share private placement investment, LifeMD stock is down 52%.



We wonder how Deutsch Capital explains this abysmal performance to its "lower middle market private equity" investor base, and suspect that Corey Deutsch's recent token open market purchases are desperate attempts to save face. It would be "unfortunate" if LFMD proved another BCII.

13