IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LIFEMD, INC. *et al*,

                    *Plaintiffs*,

          v.

CHRISTIAN MATTHEW LAMARCO, *et al*,

                    *Defendants*.

Civil Action No. 2:21-cv-1273

Hon. William S. Stickman IV

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiffs LifeMD, Inc. ("LifeMD"), Justin Schreiber ("Schreiber"), and Stefan Galluppi ("Galluppi"), filed an eight-count Complaint against Defendants Christian Matthew Lamarco ("Lamarco"), Shadyside Partners, LLC d/b/a Culper Research[1] ("Culper") and John/Jane Does 2-10 ("John Does") in the Court of Common Pleas of Allegheny County, Pennsylvania on September 17, 2021, asserting defamation (Count I), trade libel (Count II), false light (Count III), unjust enrichment (Count IV), deceptive trade practices (Count V), unfair competition (Count VI), conspiracy (Count VII) and aiding and abetting (Count VIII).[2]  (ECF No. 1-2).  On September 23, 2021, Lamarco and Culper removed the case to the United States District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. § 1332.  (ECF No. 1).  Lamarco and Culper then moved for the dismissal of Counts I through VII under Federal Rule of Civil Procedure 12(b)(6)

---

[1] Christian Matthew Lamarco is the sole employee and member of Culper Research.  (ECF No. 1-2, ¶ 13).

[2] Count VIII for aiding and abetting was brought only against John Does.  (ECF No. 1-2, p. 32).

("Rule 12(b)(6)").  (ECF No. 6).  For the following reasons, the Court will deny in part and grant in part Lamarco's and Culper's Motion to Dismiss.

## I.    BACKGROUND

### A.    Factual Background

LifeMD is a Delaware corporation with its principal place of business in New York.  (ECF No. 1-2, ¶ 8); (ECF No. 7, pp. 7, 9).  Schreiber is an individual residing and domiciled in Puerto Rico.  (ECF No. 1-2, ¶ 9).  Galluppi is an individual residing and domiciled in California.  (*Id.* at ¶ 10).  Lamarco is an individual residing and domiciled in Pennsylvania.  (*Id.* at ¶ 11).  Culper is a limited liability company under the laws of Delaware.  (*Id.* at ¶ 12).

LifeMD is a telehealth company that offers direct-to-patient products and services.  (*Id.* at ¶ 15).  Specifically, it offers subscription-based products and services, including "REX MD™—telehealth for men, Shapiro MD™—telehealth for hair loss, and Nava MD™—teledermatology offering for women."  (*Id.* at ¶ 16).  It maintains a network of licensed medical providers and doctors who are board certified to treat patients and dispense prescription medications.  (*Id.* at ¶ 19).  LifeMD is managed by a team of professionals including Schreiber and Galluppi—Schreiber serves as LifeMD's Chairman and CEO while Galluppi serves as Chief Technology Officer.  (*Id.* at ¶ 21).

Culper is an independent stock research firm that conducts investment analysis and disseminates its reports via its website, www.culperresearch.com.  (*Id.* at ¶ 12).  On or about April 14, 2021, Culper published a negative report about LifeMD entitled *LifeMD, Inc.: Redwood Redux at RexMD* ("Report"), which appeared on its website www.culperresearch.com and via Twitter using the handle @CulperResearch.  (*Id.* at ¶ 29).  On the first page of the Report, Culper provided a disclaimer that included the following statement:

> You should assume that Culper (possibly along with or through our members, partners, affiliates, employees, and/or consultants) along with our clients and/or investors has a position in any securities covered herein. Following publication of any research, we intend to continue transacting in the securities covered herein, and we may be long, short, or neutral at any time hereafter regardless of our initial recommendation, conclusions, or opinions.

(ECF No. 1-2, p. 38). The disclaimer then proceeds to state that the Report comprises the author's opinions:

> To the best of our ability and belief, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, and who are not insiders or connected persons of the securities covered herein or who may otherwise owe any fiduciary duty or duty of confidentiality to the issuer. However, such information is presented "as is," without warranty of any kind – whether express or implied. Culper makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use. ***Research may contain forward-looking statements, estimates, projections, and opinions*** with respect to among other things, certain accounting, legal, and regulatory issues the issuer faces and the potential impact of those issues on its future business, financial condition and results of operations, as well as more generally, the issuer's anticipated operating performance, access to capital markets, market conditions, assets and liabilities. ***Such statements, estimates, projections and opinions may prove to be substantially inaccurate and are inherently subject to significant risks and uncertainties beyond Culper's control. All expressions of opinion are subject to change without notice***, and Culper does not undertake to update or supplement this report or any of the information contained herein.

(*Id.*) (emphasis added).

LifeMD alleges that Lamarco, Culper, and John Does engaged in an abusive "short and distort" stock scheme. (*Id.* at ¶ 1). A "short and distort" stock scheme occurs when "short-sellers borrow securities, sell them, and then drive the price of their target company's stock down by spreading materially false, misleading, defamatory, and disparaging information about the company. Once the company's stock drops to an artificially low price, the short-sellers repurchase and return the borrowed securities, pocketing the difference." (*Id.*).

3

### B.    The Alleged Defamatory Communications

In their Complaint, Plaintiffs allege the communications in the Report "falsely accused Plaintiffs of fraud, lies, cover-ups, potential crimes and illegal acts, insider dealing, and abusive, unfair, and deceptive business practices."  (*Id.* at ¶ 3).   Plaintiffs also allege that the communications caused significant harm, including:

> artificial depression of LifeMD's stock price and market value; higher costs of capital; expenses to defend against class action lawsuits and negative media attention; damage to business relationships with contractual partners, investors, bankers, and other lenders; injury to Plaintiffs' reputation and goodwill; emotional pain, suffering, and humiliation for the individual Plaintiffs; and disruption of the business affairs of LifeMD, which continues to this day as Plaintiffs seek to attract investors, recruit talent, and form strategic partnerships.

(*Id.* at ¶ 4).  The alleged defamatory communications are as follows:

> a.    *Redwood Scientific*. "Importantly, LifeMD executives - including CEO Justin Schreiber, CTO Stefan Galluppi, and the Company's two former CFOs - have apparently covered up their involved [sic] in Redwood Scientific's 'wide ranging fraud', which we think LifeMD now mirrors." Report at 2. "Undisclosed to current LifeMD investors, numerous LFMD insiders were intimately involved in varying aspects of Redwood [Scientific]'s 'wide-ranging fraud.'" *Id.* "We are highly concerned that LifeMD executives have not disclosed their involvement in material fraud, namely in Redwood Scientific, prior to joining LifeMD. We find this especially concerning in light of the business practices we believe are occurring at LifeMD which mirror those that landed Redwood federal charges." *Id.* at 3. Furthermore, the Defendants not only executed the fraud at Redwood, but after it was discovered, were found to have lied and obstructed the Courts, hiding their millions in illicit proceeds generated from the scheme. We believe many of these same practices have made their way to LifeMD, where the Company is now subjecting itself to the same risks." *Id.* "Apparently, unbeknownst to LifeMD investors, at least 4 current and past LifeMD executives were intricately involved in Redwood." *Id.* at 4. "LifeMD's corporate presentation touts its supposed 'proven management team' yet the slide conspicuously omits Schreiber and Galluppi's involvement in the Redwood Scientific Fraud." *Id.* "LifeMD Practices Mirror the Redwood Scientific Fraud." *Id.* at 5. "In light of the Company's apparent cover-up of involvement in the 'wide-ranging fraud' at Redwood (per the FTC), we are particularly concerned by LifeMD practices which we think mirror those at Redwood." *Id.* "Apart from the Company's apparent use of unlicensed doctors to dispense pills, we think LifeMD's current business practices mirror the same ones which landed Redwood in hot water." *Id.* at 10.

b.    *Unlicensed Doctors*. "Namely, LifeMD appears to use unlicensed doctors to dispense OTC medications ..." Report at 2. "Not only does this render LifeMD's claims patently false, but potentially leaves the Company liable as an instrument to felony distribution of controlled substances." *Id.* "Redwood even claimed a revolutionary product for erectile dysfunction, just as LifeMD now apparently sells OTC ED pills relying on unlicensed doctors." *Id.* at 3. "This suggests, in our view, that LifeMD is either willfully ignorant of its doctors, or complicit in felonious acts." *Id.* at 7. "Apart from the Company's apparent use of unlicensed doctors to dispense pills, we think LifeMD's current business practices mirror the same ones which landed Redwood in hot water." *Id.* at 10.

c.    *Insider Transactions*. "That said, this torrential cash burn hasn't stopped LFMD insiders from using the Company as a personal piggy bank. In 2020, $37.0 million in stock compensation was paid to insiders, not to mention numerous related party transactions. CEO Schreiber's father warehouses and fulfills the Company's Shapiro MD shampoo orders, and LifeMD paid CEO Schreiber 900,000 shares in 2019-an exorbitant sum-merely for credit card processing services." Report at 2-3. "At LifeMD, Insiders Win While Common Shareholders Lose." *Id.* at 15. "Despite the Company's torrential cash burn, insiders have collected healthy paychecks." *Id.* "This sheer level of insider enrichment concerns us, given Schreiber's propensity to participate in stock promotion schemes in which common shareholders are left holding the bag." *Id.* "Stock awards aside, insiders have enriched themselves via related-party transactions." *Id.*

d.    *Deceptive Business*. "Namely, LifeMD appears to use unlicensed doctors to dispense OTC medications, has implemented an autoshipping/autobilling scheme, failed to honor guarantees, and put in place abusive telemarketing practices." Report at 2. "In October 2018, Redwood was charged by the FTC for 'wide-ranging fraud' which implemented unlawful autoshipping, abusive telemarketing, and false claims of its products. At LifeMD, numerous customer reviews lead us to believe that the Company has implemented the same tactics. LifeMD touts its 'recurring revenue' model yet we think much of the Company's revenues are generated under false pretenses of 'one-time purchases.'" *Id.* "In short, we think LifeMD's business is fatally flawed, unsustainable, and likely to draw regulatory scrutiny, especially in light of Schreiber and Galluppi's histories." *Id.* at 5. "Instead, we think LifeMD is a cash-burning direct marketing response business. The core driver of Rex MD, the Company's pill-pushing business, is a paid search and web marketing operation which only incinerates more shareholder cash over time." *Id.* at 8. "Apart from the Company's apparent use of unlicensed doctors to dispense pills, we think LifeMD's current business practices mirror the same ones which landed Redwood in hot water. Namely, numerous customer reviews allege that the Company engages in autoshipping, makes cancellations difficult if not impossible, and telephones consumers possibly in violation of TCPA laws." *Id.* at 10. "We think that a business whose core strength is built upon customer deception is unsustainable." *Id.* at 12.

e.      *Cover-Up & Lies.* "Importantly, LifeMD executives - including CEO Justin Schreiber, CTO Stefan Galluppi, and the Company's two former CFOs - have apparently covered up their involved [sic] in Redwood Scientific's 'wide ranging fraud', which we think LifeMD now mirrors." Report at 2. "Finally, while LFMD disclosed in 2016 that CTO Stefan Galluppi previously served as Redwood's CTO, this disclosure was removed from Company materials in 2017, and Galluppi omits this 'experience' from his LinkedIn biography, effectively covering up involvement from current LifeMD investors." *Id.* "Not only does this render LifeMD's claims patently false, but potentially leaves the Company liable as an instrument to felony distribution of controlled substances." *Id.* "LifeMD Executives Omit 'Wide Ranging' Redwood Scientific Fraud from Their Resumes." *Id.* at 3. "We are highly concerned that LifeMD executives have not disclosed their involvement in material fraud, namely in Redwood Scientific, prior to joining LifeMD." *Id.* "Apparently, unbeknownst to LifeMD investors, at least 4 current and past LifeMD executives were intricately involved in Redwood." *Id.* at 4. "LifeMD's corporate presentation touts its supposed 'proven management team' yet the slide conspicuously omits Schreiber and Galluppi's involvement in the Redwood Scientific Fraud." *Id.* "However, in the Company's 2017 Form 10-K, the Company has removed all references to Redwood, suggesting, in our view, a cover-up attempt." *Id.* at 5. "In light of the Company's apparent cover-up of involvement in the 'wide-ranging fraud' at Redwood (per the FTC), we are particularly concerned by LifeMD practices which we think min-or those at Redwood." *Id.* "We remain unclear as to whether this was due to a change in service providers or if LifeMD is merely once again selectively disclosing negative information to investors." *Id.* at 16. "Appendix: LifeMD Has Hidden Past Involvement in Redwood Scientific." *Id.*

(ECF No. 1-2, ¶ 33).

## II.      STANDARD OF REVIEW

A motion to dismiss filed under Federal Rule of Civil Procedure ("Rule") 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A plaintiff must allege sufficient facts that, if accepted as true, state a claim for relief plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must accept all well-pleaded factual allegations as true and view them in the light most favorable to a plaintiff. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009); *see also DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 262–63 (3d Cir. 2008). Although a court must accept the allegations in the Complaint as true, it is "not compelled to accept

6

unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citations omitted).

The "plausibility" standard required for a complaint to survive a motion to dismiss is not akin to a "probability" requirement but asks for more than sheer "possibility." *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 556). In other words, the complaint's factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations are true even if doubtful in fact. *Twombly*, 550 U.S. at 555. Facial plausibility is present when a plaintiff pleads factual content that allows the court to draw the reasonable inference that a defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Even if the complaint's well-pleaded facts lead to a plausible inference, that inference alone will not entitle a plaintiff to relief. *Id.* at 682. The complaint must support the inference with facts to plausibly justify that inferential leap. *Id.*

Generally, a court may not consider an extraneous document when reviewing a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). If parties present matters outside the pleadings and the court does not exclude them, the motion must be converted to a motion for summary judgment. *See* Fed. R. Civ. P. 12(d). When reviewing the sufficiency of a complaint, however, a court may consider attachments to it without converting the motion into one for summary judgment if they are integral to the allegations in the complaint and are authentic. *See In re Burlington*, 114 F.3d at 1426 (holding that a court may consider a "document integral to or explicitly relied upon in the complaint"); *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994) (same); *Fallon v. Mercy Cath. Med. Ctr. of Se. Pa.*, 877 F.3d 487, 493 (3d Cir. 2017) (same); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see also Pension Ben. Guar. Corp. v.*

7

*White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (holding that a court may consider an "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document").

### III.   ANALYSIS

Plaintiffs assert seven claims under Delaware law against Lamarco and Culper: (1) defamation; (2) trade libel; (3) false light; (4) unjust enrichment; (5) deceptive trade practices in violation of Delaware law; (6) unfair competition in violation of Delaware law; and (7) conspiracy. (ECF No. 1-2, ¶¶ 111-162). Lamarco and Culper seek to dismiss all of the claims against them pursuant to Rule 12(b)(6). (ECF No. 6). They contend that the claims should be analyzed under New York law. In response, Plaintiffs aver that the substantive law of Pennsylvania, New York, Delaware, California, or Puerto Rico may apply to these claims. (ECF No. 7); (ECF No. 9). Accordingly, the Court must first undertake a choice of law analysis to determine which state's law applies to the claims before beginning its analysis as to the sufficiency of the allegations set forth in Plaintiffs' Complaint.

### A.   Choice of Law

The Court has subject matter jurisdiction based on diversity of citizenship. 28 U.S.C. § 1332. When a federal court exercises diversity jurisdiction the conflict of law rules of the forum state applies. *Wilson v. Slatalla*, 970 F.Supp. 405, 413 (E.D. Pa. 1997). Therefore, as the Court sits in Pennsylvania, it will apply Pennsylvania's choice of law rules. Pennsylvania employs a two-step hybrid framework to choice of law questions. Under the first step of this analysis, the Court must determine whether there is a relevant difference between the law of the jurisdictions whose laws potentially apply, *i.e.*, whether a conflict exists. *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007). If the laws of the jurisdictions are the same, "then there is no *conflict* at all, and a choice of law analysis is unnecessary." *Id.* (emphasis in original). In the

8

absence of a conflict, "the district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply" or "apply the law of the forum." *Huber v. Taylor,* 469 F.3d 67, 74 (3d Cir. 2006) (citing *On Air Entm't Corp. v. Nat'l Indem. Co.,* 210 F.3d 146, 149 (3d Cir. 2000)); *O'Malley v. Vilsmeier Auctions Co.,* 986 F. Supp. 306, 307 (E.D. Pa. 1997).

If the laws differ, the Court must examine the interests and policies underlying the law of each jurisdiction and determine whether the conflict is "true," "false," or "unprovided for." *Hammersmith,* 480 F.3d at 230–32. A false conflict exists only if one jurisdiction's governmental interests would be impaired by the application of another jurisdiction's law. *Budget Rent–A–Car v. Chappell,* 407 F.3d 166, 170 (3d Cir. 2005). When there is a false conflict, the Court must apply the law of the only interested jurisdiction. *Id.* If no jurisdiction's interest would be impaired if its laws were not applied, there is an "unprovided for" conflict and *lex loci delicti* (the law of the place of the wrong) continues to govern. *Budget Rent–A–Car Sys.,* 407 F.3d at 170 (citing *Miller v. Gay,* 470 A.2d 1353 (Pa. 1983)).

In contrast, "a 'deeper [choice of law] analysis' is necessary only if *both* jurisdictions' interests would be impaired by the application of the other's laws (*i.e.,* there is a true conflict)." *Hammersmith,* 480 F.3d at 230 (alterations in original); *see also Budget Rent–A–Car Sys.,* 407 F.3d at 170 ("A true conflict exists 'when the governmental interests of [multiple] jurisdictions would be impaired if their law were not applied.'") (quoting *Lacey,* 932 F.2d at 187 & n. 15). If a true conflict exists, the Court must "determine which state has the greater interest in the application of its law." *Hammersmith,* 480 F.3d at 231. To this end, the Court must weigh each state's contacts on a "qualitative scale according to their relation to the policies and interests underlying the [particular] issue." *Shields v. Consol. Rail Corp.,* 810 F.2d 397, 400 (3d Cir. 1987)).

The United States Court of Appeals for the Third Circuit ("Third Circuit") has held that Pennsylvania choice of law analysis "employs depecage,[3] the principle whereby different states' laws may apply to different issues in a single case." *Taylor v. Mooney Aircraft Corp.*, 265 F.App'x 87, 91 (3d Cir. 2008). Therefore, the Court must separately analyze the law of the potentially interested jurisdictions (*i.e.*, Pennsylvania, New York, Delaware, California, or Puerto Rico) regarding each of the disputed legal issues—defamation, trade libel, false light, unjust enrichment, deceptive trade practices, unfair competition, and conspiracy.

**B.      Defamation – Count I**

As to the defamation claim, Plaintiffs argue that "this Court may refer interchangeably to the laws of the states whose laws potentially apply, or rely solely on forum law because the basic elements of the central claims asserted are the same." (ECF No. 9, p. 13). Lamarco and Culper argue that "in a defamation suit where the defamatory statements were published in more than one jurisdiction [*i.e.*, the Internet], the state with the significant interest is the domicile of the plaintiff." (ECF No. 7, p. 11). They contend that "LifeMD's principal place of business is New York, it trades its stock in New York, and the individual plaintiffs allege defamation in connection with their roles at a New York company" and therefore New York law applies. (*Id.* at p. 12).

The Court finds that no real conflict exists between the laws of Pennsylvania, New York, Delaware, California, and Puerto Rico. As previously stated, a real conflict exists only where the application of each jurisdiction's substantive law would produce a contrary result. That is not the case here. The basic elements of defamation are the same in Pennsylvania, New York, Delaware, California, and Puerto Rico, and they are: (i) a false and defamatory communication regarding the plaintiff, (ii) published by the defendant, (iii) to a third party who understood the communication's

---

[3] "A French word, depecage (DE–PA–SAJ) is defined as a 'cutting up, dismembering, carving up.'" *Taylor v. Mooney Aircraft Corp.*, 265 F.App'x 87, 92, n. 5 (3d Cir. 2008).

defamatory meaning, (iv) resulting in harm to the plaintiff.  *See Porter v. Joy Realty, Inc.*, 872 A.2d 846 (Pa. Super. 2005); *Kramer v. Skyhorse Pub., Inc.*, 989 N.Y.S.2d 826, 832 (Sup. Ct. 2014); *Naples v. New Castle Cty.*, 2015 WL 1478206, at *12 (Del. Super. Ct. Mar. 30, 2015), *aff'd*, 127 A.3d 399 (Del. 2015); *John Doe 2 v. Superior Ct.*, 206 Cal. Rptr. 3d 60, 68 (2016); *Soc. de Gananciales v. El Vocero de P.R.*, 135 P.R. Dec. 122 (1994).  The Court will apply Pennsylvania law as it is the forum jurisdiction.  *O'Malley v. Vilsmeier Auctions Co.*, 986 F. Supp. 306, 307 (E.D. Pa. 1997) (stating if "no conflict exists [ ] the court should apply the law of the forum.").

### 1.    The Court Need Not Address Whether Defendants Acted with Actual Malice at this Stage

Before determining whether Plaintiffs sufficiently allege a claim of defamation, the Court must first determine whether the "actual malice" standard applies to Plaintiffs.  Lamarco and Culper argue that Plaintiffs are required to plead actual malice because they are public figures. (ECF No. 7, p. 22).  In response, Plaintiffs argue that they are not public figures and regardless of their classification as public or private figures they have sufficiently pled actual malice.  (ECF No. 9, p. 22).  The Supreme Court of the United States ("Supreme Court") has held that when a public official brings a defamation claim, he is required by the First Amendment to allege that the defamatory communication was made with actual malice.  *See New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).   Actual malice requires a showing that the purported defamatory communication is made with knowledge that the communication is false or with reckless disregard for whether the communication is false.  *Id.*  The Supreme Court has also stated that an individual can be a limited-purpose public figure where he "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues."  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974).

"The question of whether [a] [p]laintiff is a limited-purpose public figure is a . . . difficult and fact-specific [question] . . . not suitable for resolution under Rule 12(b)(6)." *Goldfarb v. Kalodimos*, 539 F. Supp. 3d 435, 455–56 (E.D. Pa. 2021) (quoting *Woods Servs. v. Disability Advocates, Inc.*, No. 18-296, 2018 WL 2134016, at *6 (E.D. Pa. May 9, 2018). "As a result, courts regularly find that the determination of a litigant's status as a public or private figure should be deferred until summary judgment when a full factual record can be developed." *Id.*; *see also Gillon v. Bernstein*, 2013 WL 5159625, at *5 (D.N.J. Sept. 12, 2013) ("the [c]ourt finds it appropriate to defer the public figure inquiry until after the record has been more fully developed through discovery."); *Trivedi v. Slawecki*, 2012 WL 5987410, at *3 (M.D. Pa. Nov. 28, 2012) (finding that the question of public figure status "is more appropriately resolved at the summary judgment stage on the basis of record evidence.").

The Court will not attempt to determine Plaintiffs' status as public or private figures without a more complete record. The Court will reserve the question of whether Plaintiffs are public figures for a later stage of the litigation.

### 2.    Plaintiffs' Defamation Claim is Sufficiency Pled

In order to successfully establish a claim for defamation under Pennsylvania law, a plaintiff has the burden of proving: (1) the defamatory character of communication, (2) its publication by the defendant, (3) its application to the plaintiff, (4) the understanding by the recipient of its defamatory meaning, (5) the understanding by the recipient of it as intended to be applied to the plaintiff, (6) special harm resulting to the plaintiff from its publication, and (7) abuse of a conditionally privileged occasion. 42 Pa. C.S. § 8343(a). Plaintiffs allege that the communications were published by Lamarco and Culper on the internet and Twitter, that they apply to Plaintiffs, and their content and applicability to Plaintiffs can be understood.  (ECF No. 1-2, p. 24). Additionally, Plaintiffs allege that the communications do not raise any privilege concerns and that

they suffered harm as a result of the communications. (*Id.*). The only element at issue is whether the communications are capable of defamatory meaning.

In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990), the Supreme Court set forth the hallmark test for whether an alleged defamatory communication is actionable, which is whether the communication is "sufficiently factual to be susceptible of being proved true or false." *Id.* at 21. The Supreme Court of Pennsylvania has accurately noted that it is the function of a court to determine whether communications are capable of defamatory meaning. *Corabi v. Curtis Publishing Co.*, 273 A.2d 899 (Pa. 1971); *Blackwell v. Eskin*, 916 A.2d 1123, 1125 (Pa. Super. 2007) (citing *Tucker v. Phila. Dailey News*, 848 A.2d 113, 124 (Pa. 2004)) (explaining that "[w]hether the contested [communications] are capable of defamatory meaning is a question of law for the court"). A communication is deemed to be defamatory "if it tends to blacken a person's reputation or expose him to public hatred, contempt, or ridicule, or injure him in his business or profession." *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 334 (Pa. Super. 2008) (citing *MacElree v. Phila. Newspapers, Inc.*, 674 A.2d 1050, 1054 (Pa. 1996)). "It is not enough that the victim of the [communications] . . . be embarrassed or annoyed, he must have suffered the kind of harm which has grievously fractured his standing in the community of respectable society." *Tucker*, 848 at 124. Importantly, only communications of fact, rather than mere expressions of opinion, are actionable under Pennsylvania law. *Moore v. Cobb–Nettleton*, 889 A.2d 1262, 1267 (Pa. Super. 2005) (citing *Elia v. Erie Ins. Exch.*, 634 A.2d 657, 660 (Pa. Super. 1993)).

Additionally, communications alleged to be defamatory must be viewed in context. *Baker v. Lafayette Coll.*, 532 A.2d 399, 402 (Pa. 1987). The Supreme Court of Pennsylvania has explained that:

> [W]ords which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable. Thus, we must consider the full context of the article to determine the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.

*Thomas Merton Ctr. v. Rockwell Int'l Corp.*, 442 A.2d 213, 216 (Pa. 1981). The touchstone in determining whether a communication is capable of defamatory meaning is how the communication would be interpreted by the average person to whom it was directed. *See Marier v. Lance, Inc.*, 2009 WL 297713, at *3 (3d Cir. 2009) ("In analyzing whether or not a communication is defamatory, Pennsylvania courts have held that '[t]he nature of the audience seeing or hearing the remarks is . . . a critical factor in determining whether the communication is capable of a defamatory meaning.'") (internal citation omitted); *Green v. Mizner*, 692 A.2d 169, 172 (Pa. Super. 1997) (stating that an assessment of whether a communication is defamatory requires the court to "consider the effect of the entire article and the impression it would engender in the minds of the average reader among whom it is circulated"). For example, a court should consider the nature of the readership of a publication in determining whether a communication contained therein is capable of defamatory meaning. *See, e.g., Sellers v. Time, Inc.*, 423 F.2d 887, 890–91 (3d Cir. 1970) (applying Pennsylvania law and considering the level of sophistication when compared with the average reader in determining whether an article is capable of defamatory meaning); *Sprague v. Am. Bar Ass'n*, Case No. 01–382, 2001 WL 1450606, at *2 (E.D. Pa. Nov. 14, 2001) (considering the average reader of the ABA Journal in determining whether the term "fixer" was capable of defamatory meaning).

Plaintiffs have identified certain communications in the Report which they claim are capable of defamatory meaning. *See* (ECF No. 1-2, ¶ 33) ("Importantly, LifeMD executives – including CEO Justin Schreiber, CTO Stefan Galluppi, and the Company's two former CFOs –

14

have apparently covered up their involved [sic] in Redwood Scientific's 'wide ranging fraud', which we think LifeMD now mirrors."); (*Id.*) ("We are highly concerned that LifeMD executives have not disclosed their involvement in material fraud, namely in Redwood Scientific prior to joining LifeMD."); (*Id.*) ("Not only does this render LifeMD's claims patently false, but potentially leaves the Company liable as an instrument to felony distribution of controlled substances."); (*Id.*) ("just as LifeMD now apparently sells OTC ED pills relying on unlicensed doctors."); (*Id.*) ("given Schreiber's propensity to participate in stock promotion schemes in which common shareholders are left holding the bag.").  Considering the Report within its overall context, the Court finds that the alleged communications are capable of defamatory meaning because they allege that Plaintiffs participated in fraud, lies and illegal business practices that could lead to criminal liability.  Such communications impugn the integrity of Plaintiffs and are capable of injuring their business or profession. *See Marcone v. Penthouse Int'l Mag. For Men*, 754 F.2d 1072, 1078 (3d Cir. 1985) (citing *Baird v. Dun & Bradstreet*, 285 A.2d 166, 171 (1971) ("Statements imputing the commission of an indictable offense are capable of defamatory meaning as a matter of law.")).

In response to Plaintiffs' allegations, Lamarco's and Culper's defense is that the communications were nonactionable opinion and, therefore, not defamatory.  (ECF No. 7, p. 12).  For an "opinion" to be deemed capable of defamatory meaning under Pennsylvania law, it must "reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." *Remick v. Manfredy*, 238 F.3d 248, 261 (3d Cir. 2001) (internal citation omitted).  The importance of the distinction between an opinion that discloses its underlying facts and one that implies the existence of undisclosed facts was explained by the Third Circuit in *Redco Corp. v. CBS, Inc.*, 758 F.2d 970 (3d Cir. 1985):

> Although there may be no such thing as a false opinion, an opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea. If the disclosed facts are true and the opinion is defamatory, a listener may choose to accept or reject it on the basis of an independent evaluation of the facts. However, if an opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the soundness of the opinion.

*Id.* at 972. Further, whether a communication qualifies as a "pure" opinion or a "mixed" opinion, which implies the existence of undisclosed derogatory facts, is a question of law to be resolved by the Court. *See Braig v. Field Comm'ns*, 456 A.2d 1366, 1372–73 (Pa. Super. 1983) ("a simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable this opinion may be or how derogatory it is."). Finally, although whether a communication is capable of defamatory meaning is a question of law for the Court to decide, it should dismiss allegations only if it is certain the communications are not susceptible to a defamatory meaning. *Goldfarb v. Kalodimos*, 539 F. Supp. 3d 435 (E.D. Pa. 2021) (citing *Gordon v. Lancaster Osteopathic Hosp. Ass'n*, 489 A.2d 1364, 1368 (Pa. Super. 1985)).

On the first page of the Report, it provides a disclaimer that indicates to the reader that the communications in the Report may include opinions of the author. (ECF No. 1-2, p. 38) ("Research may contain forward-looking statements, estimates, projections, and ***opinions*** . . . Such statements, estimates, projections and ***opinions*** may prove to be substantially inaccurate and are inherently subject to significant risks and uncertainties beyond Culper's control. All expressions of ***opinion*** are subject to change without notice . . .) (emphasis added). Additionally, the first sentence of the Report disclosed that Culper was "short" LifeMD, which would indicate to a reasonable reader of an investigative financial research report—such as the Report—that Culper would benefit from LifeMD's stock value decreasing. The Report attempts to shield itself from

defamatory communications by prefacing the communications with disclaimers such as "we think" and "we believe." *See* (ECF No. 1-2, p. 39) ("have apparently covered . . . which we think"); (*Id.* at p. 40) ("We are highly concerned . . ."); (*Id.* at p. 40) ("We find . . . we believe"); (*Id.* at p. 40) ("We believe . . ."); (*Id.* at p. 41) ("Apparently . . ."); (*Id.* at p. 44) ("This suggests, in our view . . ."); (*Id.* at p. 42) ("we are particularly concerned . . . which we think"); (*Id.* at p. 47) ("apparent use . . . we think").

In their briefing, Plaintiffs correctly argue that courts have consistently held that prefatory disclaimers and exculpatory words cannot save the statements at issue from being defamatory. (ECF No. 9, p. 18). "It would undermine the law of defamation if speakers or authors could simply employ a talismanic word formula to absolve themselves of slander or libel." *ZAGG, Inc. v. Catanach*, 2012 WL 4462813, at *3 (E.D. Pa. Sept. 27, 2012) (citing *Milkovich*, 497 U.S. at 18-19). The statement, "'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.' . . . [It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'" *Milkovich*, 497 U.S. at 18-19. The Court finds that the Report's prefatory disclaimers and exculpatory words are not enough to absolve the communications of defamatory meaning.

Lamarco and Culper also argue that the Report is protected as "pure" opinion because they disclosed supporting factual material. (ECF No. 7, p. 13). The Court disagrees. Plaintiffs correctly state that the "pure" opinion rule "does not apply unless all the supporting factual materials are disclosed and none are incorrect or have been misinterpreted." (ECF No. 9, p. 21). "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion

17

of fact." *Milkovich* at 18-19. Lamarco and Culper did not disclose factual materials showing that Plaintiffs committed or covered up fraud at Redwood Scientific or have since committed or covered up fraud at LifeMD. For example, Lamarco and Culper represented in the Report that Plaintiffs were "intimately involved" in a "wide ranging" and "material" fraud at both companies that they have hidden from investors. (ECF No. 1-2, p. 40) ("We are highly concerned that LifeMD executives have not disclosed their involvement in material fraud, namely in Redwood Scientific, prior to their joining LifeMD. We find this especially concerning in light of the business practices we believe are occurring at LifeMD which mirror those that landed Redwood federal charges."). Additionally, Lamarco and Culper did not disclose factual materials showing a wide-spread use of "felonious acts" surrounding unlicensed doctors or "insider" transactions. (*Id.* at p. 47) ("Apart from the Company's apparent use of unlicensed doctors to dispense pills, we think LifeMD's current business practices mirror the same ones which landed Redwood in hot water."); (*Id.* at p. 52) ("Stock awards aside, insiders have enriched themselves via related-party transactions."). Because Lamarco and Culper failed to disclose materials to support the above-mentioned communications they cannot be "pure" opinions.

The Court finds that the communications are capable of defamatory meaning because accusations of fraud, lies, and criminal liability blacken Plaintiffs' reputation in the eyes of the average reader of the Report and potentially expose them to public hatred, contempt or injury to their business. Additionally, these communications are not shielded under the guise of "pure" opinion. The Court will deny Lamarco's and Culper's motion to dismiss Count I.

## C.     Trade Libel – Count II

As to Plaintiffs' trade libel claim, the Court finds that no real conflict exists between the laws of Pennsylvania, New York, Delaware, California, and Puerto Rico. *See Pro Golf Mfg., Inc. v. Trib. Rev. Newspaper Co.*, 809 A.2d 243, 246 (Pa. 2002); *Penn Warranty Corp. v. DiGiovanni*,

810 N.Y.S.2d 807, 813 (Sup. Ct. 2005); *Incyte Corp. v. Flexus Biosciences, Inc.*, 2017 WL 7803923, at *7 (Del. Super. Ct. Nov. 1, 2017); *ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1010–11 (Cal. Ct. App. 2001); *Torres Silva v. El Mundo, Inc.*, 106 P.R. Dec. 415 (P.R. 1977). The parties do not address any conflict with respect to the laws of Pennsylvania, New York, Delaware, California, and Puerto Rico on the tort of trade libel. As no party has cited to a potential conflict between these forums, and the Court *sua sponte* has determined that the basic elements required under these jurisdictions are the same, the Court finds that no conflict exists and the law of Pennsylvania will apply as it is the forum jurisdiction. *See Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir. 1994) (avoiding choice of law question where neither party pressed the issue and there was no apparent conflict between the laws of the forums) (citing *Melville v. Am. Home Assurance Co.*, 584 F.2d 1306, 1311 (3d. Cir. 1978) (warning courts to avoid dicta on conflicts questions when not put in issue by the parties)); *O'Malley* 986 F. Supp. at 307.

Under Pennsylvania law, trade libel is actionable where: (1) the communication is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the communication is false or acts in reckless disregard of its truth or falsity. *Pro Golf Mfg., Inc.*, 809 A.2d at 246. Lamarco and Culper's preliminary argument is that Plaintiffs' claim fails because communications of opinion cannot support trade libel. (ECF No. 7, p. 24). The Court disagrees. It has already found that the communications are not protected opinion. The only element that Lamarco and Culper argue is not sufficiently pled is actual malice, *i.e.*, whether the publisher knew that the communication was false or acted in reckless disregard of its truth or falsity. The Court finds that Plaintiffs have sufficiently pled actual malice. Plaintiffs allege that Lamarco and Culper made serious accusations alleging fraud, lies, and potential

criminal liability without confirming or denying the veracity of them, which satisfies the actual malice element requiring the publisher of the communications to act in reckless disregard of its truth or falsity. The Court will deny Lamarco's and Culper's motion to dismiss Count II.

**D.      False Light – Count III**

Lamarco and Culper have made a sufficient showing that there are genuine conflicts of law between the laws of the interested jurisdictions because New York does not recognize the tort of false light, while the remaining jurisdictions do. (ECF No. 7, p. 25). Some choice of law issues do not require a full factual record and may be resolved on a motion to dismiss. Here, however, the Court is unable to make the fact-intensive choice of law determination at this stage. *See First Choice Fed. Credit Union v. Wendy's Co.*, No. CV 16-506, 2017 WL 1190500, at *1 (W.D. Pa. Mar. 31, 2017); *First Nat'l Bank of Pa. v. Transamerica Life Ins. Co.*, 2015 WL 321657 (W.D. Pa. Jan. 23, 2015) ("[T]he Court finds that at this stage, where the record is not fully developed and there remain several factual issues to be resolved, a conflict of law analysis would be inappropriate.") (citing *Reginella Const. Co., Ltd. v. Travelers Cas. and Sur. Co. of Am.*, 949 F. Supp. 2d 599, 610 (W.D. Pa. 2013), *aff'd*, 568 Fed.Appx. 174 (3d Cir. 2014) ("A choice of law analysis is appropriate at the Rule 12(b)(6) stage when it is not dependent on factual issues that can be probed only with the assistance of a fully developed record.")); *Highland Tank & Mfg. Co. v. PS Int'l, Inc.*, 2010 WL 1253887 (W.D. Pa. Mar. 30, 2010) (explaining that the court deferred its ruling on choice of law in its motion to dismiss opinion.). It will defer its choice of law decision until the parties present a factual record full enough to permit the Court to "determine which state has the greater interest in the application of its law." *Hammersmith*, 480 F.3d at 231.

Nevertheless, the Court must still determine whether Plaintiffs have sufficiently pled a false light claim to survive the pending motion to dismiss. Since Plaintiffs have made their allegations under Delaware law, the Court will apply Delaware law only for the limited purpose of examining

Plaintiffs' claim under the Rule 12(b)(6) standard. *See Snyder v. Farnam Companies, Inc.*, 792 F.Supp.2d 712 (D.N.J. 2011); *Harper v. LG Elecs. USA, Inc.*, 595 F.Supp.2d 486, 491 (D.N.J. 2009) (examining the claims under the assumption that New Jersey law governs as that is what the plaintiffs presented, where the choice of law analysis was not yet proper). According to Delaware law, the tort of false light occurs when "someone, knowing of or in reckless disregard for the falsity of their statements, gives "publicity to something that places plaintiff in a false light before the public where the false light is highly offensive to a reasonable person." *Images Hair Sols. Med. Ctr. v. Fox News Network, LLC*, 2013 WL 6917138, at *5 (Del. Super. Ct. Dec. 20, 2013).

Lamarco and Culper's entire argument in relation to Plaintiffs' false light claim consists of one sentence in which they state "New York does not recognize the tort of false light." (ECF No. 7, p. 25). As already noted, the law of the other jurisdictions possibly implicated, like Delaware, recognize this tort. In accepting all of Plaintiffs' claims as true under the Rule 12(b)(6) standard, the Court finds that Plaintiffs sufficiently pled a claim for false light at this stage. (ECF No. 1-2, ¶¶ 131-135). The Court will deny Lamarco's and Culper's motion to dismiss Count III.

### E.     Unjust Enrichment – Count IV

The Court finds that no real conflict exists between the laws of Pennsylvania, New York, Delaware, California, and Puerto Rico for Plaintiffs' unjust enrichment claim. The basic elements of unjust enrichment are the same, and they require a plaintiff to allege that: (i) the other party was enriched, (ii) at that party's expense, and (iii) acceptance and retention of such benefits under such circumstances would be inequitable for a defendant to retain the benefit without payment of value. *See Artisan Builders, Inc. v. Jang*, 271 A.3d 889, 892 (Pa. Super. 2022); *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743 (N.Y. 2012); *Nemec v. Shrader*, 991 A.2d 1120 (Del. 2010); *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1587 (Cal. Ct. App. 2008); *Hatton v. Mun. de Ponce*, 134 P.R. Dec. 1001 (P.R. 1994). Again, the Court will apply Pennsylvania law as it is the forum

jurisdiction. *See also Huber v. Taylor,* 469 F.3d 67, 74 (3d Cir. 2006) (stating "the district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply.").

Under Pennsylvania law, in order to successfully establish a claim for unjust enrichment, Plaintiffs must allege that they conferred a benefit on Lamarco and Culper, that Lamarco and Culper appreciated the benefit, and that Lamarco and Culper accepted and retained the benefit under circumstances that would make it inequitable for them to retain the benefit without payment for value. *Artisan Builders, Inc.,* 271 at 892 (Pa. Super. 2022). In *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.,* 2 A.3d 526 (Pa. 2010), the Supreme Court of Pennsylvania noted:

> [u]njust enrichment is the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected, for which the beneficiary must make restitution. Black's Law Dictionary (8th ed. 2004). An action based on unjust enrichment is an action which sounds in quasi-contract or contract implied in law.

*Id.* at 531.

Plaintiffs' Complaint alleges that they conferred a benefit on Lamarco and Culper "in the form of rights and opportunities to engage in trades of securities in LifeMD" and that Lamarco and Culper accepted and retained profits from short sales without payment to Plaintiffs or justification. (ECF No. 1-2, p. 28). In response, Lamarco and Culper contend that Plaintiffs' unjust enrichment claim is "not viable because Plaintiffs failed to allege that [Lamarco and] Culper received a benefit from Plaintiffs, as any short-selling profit did not come from Plaintiffs but rather through stocks bought and sold." (ECF No. 7, p. 25). They are correct in arguing that the profits they received did not come from Plaintiffs, but from the stocks bought and sold on the stock exchange. *Silvercorp Metals Inc. v. Anthion Mgmt. LLC,* 36 Misc. 3d 1231(A), 959 N.Y.S.2d 92 (Sup. Ct. 2012) (stating that "In seeking the disgorgement of defendants' [short selling] profits,

[plaintiffs] cannot allege that defendants had been unjustly enriched at [plaintiff's] expense, since [plaintiff] did not make any payments or financially contribute to the profits defendants received. The profits defendants received simply did not come from [plaintiffs], but from the shares bought and sold on the stock exchanges."). Accordingly, Plaintiffs fail to allege that Lamarco and Culper received a benefit from Plaintiffs. The Court will grant Lamarco's and Culper's motion to dismiss Count IV.

### F.      Deceptive Trade Practices – Count V

The parties have made a sufficient showing that there are genuine conflicts of law between the interested jurisdictions as to the tort of deceptive trade practices. (ECF No. 1-2, p. 29); (ECF No. 7, p. 25); 6 Del. C. § 2532; N.Y. Gen. Bus. Law § 349 (McKinney); 73 Pa. Stat. Ann. § 201-2. The Court will defer its choice of law decision until the parties present a factual record full enough to permit this Court to "determine which state has the greater interest in the application of its law." *Hammersmith,* 480 F.3d at 231. The Court must still examine Plaintiffs' claim pursuant to the Rule 12(b)(6) standard. *Farnam Companies, Inc.*, at 712. Since Plaintiffs have made their allegations under Delaware law, the Court will apply Delaware law only for the limited purpose of examining Plaintiffs' claim under the Rule 12(b)(6) standard. *See Snyder v. Farnam Companies, Inc.*, 792 F.Supp.2d 712 (D.N.J. 2011). Plaintiffs have sufficiently pled a claim under Delaware's Uniform Deceptive Trade Practices Act, which states in part that:

> (a) A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:
> (1) Passes off goods or services as those of another;
> (2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
> (3) Causes likelihood of confusion or of misunderstanding as to filiation, connection, or association with, or certification by, another;
> (4) Uses deceptive representations or designations of geographic origin in connection with goods or services;
> (5) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have,

or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;

(6) Represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

(7) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(8) Disparages the goods, services, or business of another by false or misleading representation of fact;

(9) Advertises goods or services with intent not to sell them as advertised;

(10) Advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(11) Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of, price reductions; or

(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

(b) In order to prevail in an action under this chapter, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

(c) This section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this State.

6 Del. C. § 2532. Plaintiffs allege that in the course of Lamarco's and Culper's business they "disparaged the goods, services, or business of Plaintiffs by false or misleading representations of fact . . . and engaged in conduct that created a likelihood of confusion or of misunderstanding with respect to Plaintiffs' goods, services, or business." (ECF No. 1-2 ¶¶144-45). Plaintiffs allege that Lamarco and Culper engaged in conduct—publishing the Report—which created a likelihood of confusion or misunderstanding about LifeMD. Since the alleged communications are capable of defamatory meaning, they can also create a likelihood of confusion or misunderstanding with respect to LifeMD's goods, services and business. At this stage of the proceedings, Plaintiffs have sufficiently pled their deceptive trade practices claim. The Court will deny Lamarco's and Culper's motion to dismiss Count V.

**G.    Unfair Competition – Count VI**

The parties have made a sufficient showing that there are genuine conflicts of law between the laws of the interested jurisdictions as to the tort of unfair competition.[4] *See* (ECF No. 1-2, p. 30); (ECF No. 7, p. 25); *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *5 (Del. Ch. Jan. 20, 2009); *Snakepit Auto., Inc. v. Superformance Int'l, LLC*, 859 N.Y.S.2d 906 (Sup. Ct. 2008). The Court will defer its choice of law decision until the parties present a factual record full enough to permit this Court to "determine which state has the greater interest in the application of its law." *Hammersmith*, 480 F.3d at 231.

Nevertheless, the Court must still examine Plaintiffs' claim pursuant to the Rule 12(b)(6) standard. *Farnam Companies, Inc.*, at 712.  Since Plaintiffs have made their allegations under Delaware law, the Court will apply Delaware law only for the limited purpose of examining Plaintiffs' claim under the Rule 12(b)(6) standard. *See Snyder v. Farnam Companies, Inc.*, 792 F.Supp.2d 712 (D.N.J. 2011).

Under Delaware law, to state a claim for unfair competition a plaintiff must allege "a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm." *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *5 (Del. Ch. Jan. 20, 2009).  Plaintiffs have sufficiently alleged that Lamarco and Culper "engaged in misconduct and/or wrongfully interfered with Plaintiffs' reasonable expectancy of entering valid business relationships with

---

[4] Lamarco and Culper state that New York law only recognizes seven causes of unfair competition, which include: (1) monopoly; (2) restraint of trade; (3) trade secrets; (4) trademark or trade name infringement; (5) palming off; (6) misappropriation; and (7) false labeling or advertising. 2 N.Y. PJI3d 3:58, p. 535 (2008).  In contrast, Delaware law more broadly recognizes unfair competition as "a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm." *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *5 (Del. Ch. Jan. 20, 2009).

contractual partners, investors, bankers, other lenders, and the media, by, among other things, making and publishing false, misleading, defamatory, offensive, and disparaging statements about Plaintiffs." (ECF No. 1-2, ¶ 151). Plaintiffs further allege that amongst other things they "lost potential investors, as well as business and recruiting opportunities, as a result of the false and defamatory accusations in the Report, including potential loans and investment in excess of $40M to be used for capitalization and expansion, and potential hires of software developers and other company personnel. (*Id.* at ¶ 83). Therefore, the Court will deny Lamarco's and Culper's motion to dismiss Count VI.

### H.      Conspiracy – Count VII

The Court finds that no real conflict exists between the laws of Pennsylvania, New York, Delaware, California, and Puerto Rico for Plaintiffs' civil conspiracy claim. The basic elements of civil conspiracy are the same, and they are as follows: (i) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (ii) an overt act done in pursuance of the common purpose, and (iii) actual legal damage. *Goldstein v. Phillip Morris, Inc.,* 854 A.2d 585, 590 (Pa. Super. 2004); *Abacus Fed. Sav. Bank v. Lim*, 905 N.Y.S.2d 585 (N.Y. 2010); *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006); *Navarrete v. Meyer*, 237 Cal. App. 4th 1276, 1291 (Cal. 2015); *Ortiz-Rosario v. Toys R Us Puerto Rico, Inc.*, 585 F. Supp. 2d 216, 221 (D.P.R. 2007).

Lamarco and Culper argue that Plaintiffs do not plead any plausible allegations of fact that Culper entered into any agreement with any specific party in furtherance of a purpose to damage LifeMD. (ECF No. 7, p. 25). The Court agrees. Plaintiffs simply allege that, "On information and belief: Lamarco, Culper Research, and/or John Does combined to plan and engage in unlawful acts against Plaintiffs at least two months before the Report when they began taking short positions

in LifeMD . . ."[5]  (ECF No. 1-2, ¶ 157).  They also allege that "Defendants collectively acted with or for the common purpose of, and had a meeting of the minds of, performing unlawful acts against Plaintiffs, including making and publishing false, misleading, defamatory, offensive and disparaging statements about Plaintiffs." (*Id.* ¶ 158).  These allegations do not sufficiently describe the role the John Does played in the conspiracy.  Plaintiffs' allegations, which are "naked assertions devoid of further factual enhancement," lack sufficient facial plausibility to draw a reasonable inference that a conspiracy existed.  In other words, the Court cannot draw a reasonable inference that Lamarco or Culper is liable for the alleged conspiracy based on these allegations alone.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Morris v. First Union National Bank*, 2002 WL 47961, at *6 (E.D. Pa. 2002) (dismissing a civil conspiracy claim against John Doe defendants for failure to allege sufficient facts); *Southwest Materials Handling Co. v. Nissan Motor Co., Ltd.*, 2000 WL 1664160, at *6 (N.D. Tex. 2000) (stating with respect to civil conspiracy allegations against John Doe defendants: "This Court is not in the position of channeling or divining potential co-conspirators who are presently as tangible as Santa Claus, the Easter [B]unny or the Tooth Fairy").  The Court will grant Lamarco's and Culper's motion to dismiss Count VII.

---

[5] Plaintiffs also allege that "on information and belief, Lamarco is the sole member of Culper Research; owns and controls Culper Research; and, at all relevant times, directed, authorized, and/or was responsible for false and defamatory statements made about, and tortious acts against, Plaintiffs by Culper Research." (ECF No. 1-2, ¶ 13).  The conspiracy must therefore include John Does.  *See Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 473 (Pa. 1979) (finding that "to hold that Ralph could have entered into an illegal agreement with the legal entity of which he was sole stockholder, director and officer would be without legal or rational basis. Summary judgment was therefore properly entered as to Ralph and Pike Coal on the conspiracy charge.").

## IV.   CONCLUSION

For these reasons, Lamarco's and Culper's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) will be denied in part and granted in part.  (ECF No. 6).  An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

6/13/2022
Dated